1
2
3
4
5
6
7
8             UNITED STATES  DISTRICT COURT
9               Northern District of California
10                  San Francisco Division
11   THOMAS E SMITH,                          No. C 12-03533 LB

12              Plaintiff,          **ORDER GRANTING DEFENDANTS'**
                                    **MOTION FOR SUMMARY**
13        v.                        **JUDGMENT**

     STEVEN HARRINGTON, PhD., et al.,
14                                  [Re: ECF No. 84]
               Defendants.
15   _____/

16                            **INTRODUCTION**

17        In this civil rights action,  Plaintiff Thomas Smith sues the Santa Rosa City School District

18   ("District") for retaliation in violation of the Americans with Disabilities Act of 2008 ("ADA") and

19   section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), and he sues four school district

20   officials for violating his Fourteenth Amendment due process right to familial association.  The four

21   school officials are as follows: (1) Sharon Liddell, the District's Superintendent; (2) George

22   Valenzuela, the District's Compliance Officer and attorney; (3) Stephen Mayer, Principal of Proctor

23   Terrace Elementary School; and (4) Kim Craven, the District's school psychologist (collectively, the

24   "Individual Defendants").  He filed his lawsuit after the Sonoma County Human Services

25   Department ("SCHSD") removed his daughter A.S. from his custody based in part on two school

26   officials' reports of child abuse.  Mr. Smith claims that reports are false and were submitted to

27   SCHSD in retaliation for his advocacy efforts on behalf of his daughter, who was diagnosed with

28

*Left margin (vertical):* **UNITED STATES DISTRICT COURT** For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

Tourette's Disorder.

Defendants move for summary judgment on Mr. Smith's three claims on the grounds that the California Court of Appeal necessarily decided Mr. Smith's challenges to the allegedly false reports in the dependency proceedings concerning A.S. and, in any event, Mr. Smith does not raise genuine issues of material fact that preclude summary judgment. The court agrees and grants summary judgment in favor of Defendants.

**STATEMENT**

## I. FACTS

The court now sets forth the facts that are supported by authenticated, admissible evidence. (*See* 2/9/2015 Evidentiary Order, ECF No. 97[1]; 3/11/2015 Evidentiary Order, ECF No. 104.[2])

**A. Mr. Smith's Complaints about the Bullying of, and His Request for a Special Education Assessment for, His Daughter A.S.**

Mr. Smith enrolled his daughter A.S. in Proctor Terrace Elementary School for the 2011-12 school year. (First Declaration of Thomas Smith, ¶ 2, ECF No. 94-5 ("First Smith Decl.").) For the first six months of the school year, from August 2011 until February 2012, Mr. Smith says that he had a very positive parent-teacher relationship with A.S's third grade teacher, Nancy Koski. (*Id.*) Ms. Koski confirms Mr. Smith's view. (First Declaration of Thomas Moore, ECF No. 94-4 ("First Moore Decl."), Ex. VV (Nancy Koski deposition).) During these months, Mr. Smith was actively involved in A.S's schooling: he helped construct the garden on the school's campus; he walked A.S. to and from school every day; and he interacted and socialized with many of the parents of A.S.'s classmates at several school events without incident. (First Smith Decl., ¶ 2.) He also interacted with Ms. Koski on almost a daily basis. (First Smith Decl., ¶ 3.)

In December 2011, Mr. Smith says that A.S. confided in him that she had been bullied by a

---

[1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] Consideration of the evidence that the court precluded would not change the outcome of this order.

classmate, "P," since the start of the school year.  (First Smith Decl., ¶ 4.)  On December 20, 2011, Mr. Smith sent Ms. Koski an email regarding P's alleged bullying of A.S.  (First Smith Decl., Ex. A; Declaration of Steven Eichman, ECF No. 84-2 ("Eichman Decl."), Ex. L.)  The next day, Ms. Koski forwarded the email to Principal Mayer and asked to talk with him about both it and another email regarding P.  (First Smith Decl., Ex. A.)  She also spoke with P about her behavior (which Ms. Koski said could be "bossy" sometimes, *see* First Moore Decl., Ex. VV) and talked to her class about bullying and teasing.  (Eichman Decl., Ex. L.)  She did not reply to Mr. Smith regarding his email.  (First Smith Decl., ¶ 5.)

On February 14, 2012, the District received a letter from Mr. Smith requesting that A.S., who at that time was eight years old, be evaluated for an individualized education program ("IEP"). (Eichman Decl., Ex. B).  The request included a note from A.S.'s doctor indicating that A.S. had received a presumptive diagnosis of Tourette's Disorder on February 9, 2012.  (*Id.*)  In response, the District initiated the assessment process.  (*See* Eichman Decl., Ex. C (February 21, 2012 letter outlining the assessment process).)  On February 21, 2012, Kim Craven, the District's psychologist, wrote Mr. Smith a letter acknowledging Mr. Smith's request for an IEP and asking him to sign and return a formal "assessment plan" (which she enclosed).  (*Id.*)  She noted that A.S. could not be evaluated until he returned it to her.  (*Id.*)  She also asked Mr. Smith to fill out and return a "Health and Development Questionnaire" (also enclosed) and to sign a "release and exchange of information" form (also enclosed) so she could communicate directly with A.S.'s medical providers as part of the assessment process.  (*Id.*)

From February 15, 2012 (the day after the District received Mr. Smith's letter) to April 10, 2012, Mr. Smith sent a series of letters and e-mails to various District offices complaining, in part, that A.S. was being bullied by her classmates at Proctor Terrace Elementary School because of her disability (Tourette's Disorder).  In an email dated February 15, 2012, Mr. Smith identified P in particular, whom he believed was targeting A.S., and he stated that he believed A.S. had been "hazed" because of her disability.  (First Smith Decl., Ex. C.)  Mr. Smith said that if the problem was not resolved, he would have no choice but to file a complaint based on discrimination and child

UNITED STATES DISTRICT COURT
For the Northern District of California

neglect.  (*Id.*)  Then, on February 21, 2012, the District received a handwritten letter from Mr. Smith stating that A.S. had been chased by four girls and poked with a branch during recess.  (First Smith Decl., Ex. D.)  And on February 23, 2012, Mr. Smith spoke to Principal Mayer on the phone, during which time Mr. Smith told Principal Mayer that he had spoken to the United States Department of Education, Office of Civil Rights about A.S.'s being bullied.  (First Smith Decl., Ex. E.)

The District and its employees responded to Mr. Smith's concerns about bullying.  (*See* First Declaration of Rebecca Widen, ECF No. 84-3 ("First Widen Decl."), Ex. DD (Thomas Smith deposition and exhibits), EE (Nancy Koski deposition and exhibit).)  Principal Mayer spoke with Ms. Koski about the alleged bullying, and together they interviewed A.S. and P.  Principal Mayer documented the interviews immediately thereafter on February 22, 2012.  (*See* Eichman Decl., Exs. F, G, H (interview notes).)

On February 24, 2012, Principal Mayer provided Mr. Smith with a letter explaining the results of their investigation.  (Eichman Decl., Ex. I.)  Principal Mayer informed Mr. Smith that P told A.S. that her face looked "weird" when it "spasmsed" at one point during the class field trip on February 14, 2012.  (*Id.*)  P said it was the first time she had ever seen A.S.'s face do that.  (*Id.*)  P became aware that A.S.'s feelings were hurt by the comment, and she discussed it with her mother later that evening.  (*Id.*)  P's mother told her that A.S. was probably embarrassed.  (*Id.*)  P also said that she considered A.S. her "best friend" at Proctor Terrace.  (*Id.*)  A.S. also stated that there had been no further comments about the incident and it occurred only one time.  (*Id.*)

With regard to the poked-with-a-branch incident, A.S. said that the girls were younger (they were in first grade), and they had a branch from a rosemary shrub that they were pointing and wiggling at A.S. and her friend.  (*Id.*)  A.S. told the girls to stop and they did stop.  (*Id.*)  A.S. said she did not report the incident to an adult at school because the girls stopped, and she wanted to keep playing.  (*Id.*)

Finally, Mr. Smith had expressed concern that a male student had thrown his backpack and it slid past A.S. and went under a bench.  (*Id.*)  Principal Mayer's investigation revealed that the student had thrown his backpack to the bench where students in the class put their backpacks before

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   going to their P.E. class in the morning.  (*Id.*)  A.S. was not near where the backpack was

2   thrown, and it was not thrown at her.  (*Id.*)

3       Based on the information gathered, Principal Mayer concluded that there did not appear to be a

4   pattern of bullying directed at A.S. and that the incidents Mr. Smith was concerned about appeared

5   to be isolated and done without malice or ill-will.  (*Id.*)  He assured Mr. Smith that A.S. had been

6   made aware, through the school's anti-bullying curriculum, that if she has problems with other

7   students, she has options, which include her using words to deal with situations with other students

8   and going to an adult at the school for assistance.  (*Id.*)  He also assured Mr. Smith that A.S. had

9   been reminded that she should tell her teacher, a playground supervisor, or another adult at school if

10  she has any problems with other students.  (*Id.*)

11      On February 24, 2012 (the same day Principal Mayer provided Mr. Smith with the above-

12  described letter), Mr. Smith came into the Proctor Terrace office requesting to see A.S.'s cumulative

13  file.  (*See* Eichman Decl., Ex. W.)  The office manager said that at the beginning of the encounter he

14  behaved aggressively, asked why certain documents were in the cumulative file and medical file,

15  and told "Connie," the "Elementary Tech.," that a "lousy job" was being done to maintain them.

16  (*Id.*)  He also asked several other questions, which Connie was able to answer.  (*Id.*)  Mr. Smith

17  calmed down, apologized to Connie, and said that he was not trying to tell her what to do.  (*Id.*)  He

18  then said that there had been a "failed IEP" at A.S.'s previous school because that school "couldn't

19  do the process properly."  (*Id.*)  He further said that he believed Proctor Terrace "will be able to do

20  it" and that he "has faith in Proctor Terrace."  (*Id.*)

21      Also as part of the investigation into Mr. Smith's concerns about bullying, Ms. Craven observed

22  A.S. in the classroom, at lunch, and on the playground, over a two-day period.  (*See* Widen Decl.,

23  Ex. FF (Kim Craven deposition and exhibits).)  Ms. Craven was told about Mr. Smith's concerns,

24  and she observed A.S. to determine if A.S. was being bullied or if A.S. seemed anxious because of

25  the way other students treated her.  (*Id.*)  On February 28, 2012, Ms. Craven provided Mr. Smith

26  with a letter informing him that A.S.'s social-emotional functioning in the classroom, at her lunch

27  table, and on the playground seemed healthy and within normal limits.  (Widen Decl., Ex. GG.)  She

28

CV 12-03533 LB
ORDER

5

1  also told Mr. Smith that A.S.'s peers interacted respectfully and appropriately with her in all

2  settings, A.S. did not exhibit outward signs of anxiety, and A.S.'s teacher (Ms. Koski) did not report

3  any incidents of bullying or harassment of A.S.  (*Id.*)  In that same letter, Ms. Craven once again

4  informed Mr. Smith that he needed to sign and return a formal assessment plan (which she enclosed

5  once more) before A.S. could be evaluated for an IEP.  (*Id.*)  She also asked Mr. Smith again to fill

6  out and return a health and development questionnaire and to sign a "release and exchange of

7  information" form (both of which she enclosed) so she could communicate directly with A.S.'s

8  medical providers as part of the assessment process.  (*Id.*)

9      On February 29, 2012, Mr. Smith was at Proctor Terrace and saw Suzette Tyler, a parent of one

10  of A.S.'s classmates, taking (with Ms. Koski's permission) candid pictures of students in A.S.'s

11  class.  (First Widen Decl., Ex. DD (Thomas Smith deposition).)  He alleges that he saw Ms. Tyler

12  smiling as she reviewed the pictures on her camera, and he became angry because he believed she

13  was laughing at pictures of A.S.'s facial "tics," a symptom of Tourette's Disorder.  (*Id.*)  Principal

14  Mayer informed Ms. Tyler that Mr. Smith was angry, and she and Principal Mayer went into the

15  hallway to discuss the situation with Mr. Smith.  (Declaration of Suzette Tyler, ¶ 6, ECF No. 84-1

16  ("Tyler Decl.").)  With A.S. standing next to him, Mr. Smith loudly and angrily demanded to know

17  why Ms. Tyler was taking pictures of A.S.  (*Id.* ¶¶ 6, 8; *id.*, Ex. A (Ms. Tyler's summary of the

18  incident).)  He also kept referring to A.S.'s "disability," and asking Ms. Tyler if she was taking

19  A.S.'s picture because A.S. was "ugly."  (*Id.*, ¶¶ 7-8.)  Ms. Tyler did not know what he was talking

20  about (as she had never observed A.S. exhibit any facial tics or signs of physical disability or heard

21  anyone mention that), but in an attempt to de-escalate the situation, she immediately apologized and

22  explained that she was taking candid pictures of the class to use in the school yearbook.  (Tyler

23  Decl., ¶¶ 3, 7.)  She agreed to go through the pictures with Mr. Smith.  According to Mr. Smith, the

24  photos depicted A.S. as "sad" and exhibiting Tourette's Disorder symptoms.  (First Widen Decl., Ex.

25  DD (Thomas Smith deposition).)  According to Ms. Tyler, none of the photos depicted A.S. in that

26  manner and there were a few "particularly great shot[s]" of her.  (Tyler Decl., ¶ 9.)  Ms. Tyler

27  nevertheless went through and deleted all of the photos of A.S. at Mr. Smith's insistence.  (*Id.*)

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    After Ms. Tyler apologized once more, Mr. Smith "stormed off" down the hallway with A.S. (*Id.*)

2    Ms. Tyler later mentioned how upset she was from the encounter. (Tyler Decl., ¶ 11.)

3        Shortly thereafter, at Principal Mayer's request, Ms. Tyler wrote a summary of what occurred

4    and submitted it to the school. (Tyler Decl., Ex. A; Eichman Decl., Ex. M.) Principal Mayer also

5    reviewed the "emergency card" in A.S.'s student file and saw that Mr. Smith did not check either

6    "yes" or "no" on the line asking whether he consents to A.S.'s being photographed. (Eichman Decl.,

7    Ex. M.)

8        Later that same day, Mr. Smith called Proctor Terrace requesting information about the school's

9    anti-bullying curriculum. (Eichman Decl., Ex. Y.) Initially, he refused to identify himself. (*Id.*)

10   The person who received the phonecall put Mr. Smith on hold and went to talk to Principal Mayer

11   about the request. (*Id.*) By the time the person returned to the phone, Mr. Smith had hung up. (*Id.*)

12   The person noticed that a voicemail had been left. (*Id.*) While the person was talking to Principal

13   Mayer, Mr. Smith called back and said he hung up by accident. (*Id.*) He further said that he did not

14   initially identify himself because "it was [about] confidential information which was between him

15   and the principal." (*Id.*) Mr. Smith left his phone number and asked that Principal Mayer call him.

16   (*Id.*) The person who took the first call called Mr. Smith back and left a message, saying that

17   Principal Mayer said that if Mr. Smith has a child enrolled at Proctor Terrace, he needed to contact

18   his child's teacher, and if he did not have a child enrolled at Proctor Terrace, he needed to contact

19   the District. (*Id.*) Not long afterward, Mr. Smith came to Proctor Terrace's office looking for

20   Principal Mayer. (*Id.*) Office staff told Mr. Smith that Principal Mayer was not there at that

21   moment. (*Id.*) Mr. Mayer appeared to office staff to be very angry. (*Id.*) Mr. Smith said that he

22   wanted to file a formal complaint against a parent who was taking pictures in a classroom. (*Id.*) Mr.

23   Smith stated that he was upset not because he did not want A.S. to be in the yearbook but because no

24   one had informed him about photographs being taken. (*Id.*)

25       On March 1, 2012, Sharon Liddell, the District's Superintendent, sent an email to Principal

26   Mayer (and copying George Valenzuela, the District's Compliance Officer; Debra Sanders, the

27   District's Director of Special Services; and Gail Eagan, the Assistance Secretary to Superintendent

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Liddell) in which Superintendent Liddell recounts that Mr. Smith contacted her and stated that he

2  was unhappy with Principal Mayer's February 24, 2012 letter and that he plans to file a complaint

3  (which the District had not received at that time).  (First Moore Decl., Ex. S.)  She emphasized that

4  if A.S. did in fact have Tourette's Disorder, the District needed to look carefully at the situation.

5  (*Id.*)  Superintendent Liddell also noted that she had been informed about Mr. Smith's behavior

6  during the photography incident.  (*Id.*)  She wrote that "it was suggested that these situations may

7  require a TRO at some point."  (*Id.*)

8      On March 2, 2012, Principal Mayer replied to Superintendent Liddell's email.  (*Id.*)  As for any

9  alleged bullying, he said that staff members at the school did not know of any problems with other

10  students, other than the three incidents he investigated and detailed in his February 24, 2012 letter to

11  Mr. Smith.  (*Id.*)  He also said that playground supervisors had been "keeping an eye out" for A.S.

12  and any problems, but they had not seen any.  (*Id.*)  He further said that A.S. had not reported any

13  other incidents to her teachers or other adults, and he had not heard anything more from Mr. Smith.

14  (*Id.*)  As for the photograph incident, Principal Mayer first described both the initial incident and

15  Mr. Smith's inquiry about the school's anti-bullying curriculum.  (*Id.*)  He then stated that on March

16  1, 2012 he had an extensive conversation about Mr. Smith with Terrena Rodebaugh, the principal of

17  Wright Elementary, the school A.S. previously attended.  (*Id.*)  He said that staff at Wright

18  Elementary had many problems with Mr. Smith.  (*Id.*)  For example, Mr. Smith demanded that the

19  school switch A.S. to another classroom, and when the school did, he complained that he had not

20  been consulted.  (*Id.*)  Also, when he picked up A.S. in the afternoon, he would stand by the

21  classroom door, listen to the instruction, and then would distort what he had heard and complain

22  about it.  (*Id.*)  He also threatened "OCR complaints."  (*Id.*)  Mr. Smith also complained that A.S.

23  was being picked on, even though she was not.  (*Id.*)  He also told them that he did not want A.S. to

24  have sweets, but then he complained when A.S. did not receive one.  (*Id.*)  He told the school that

25  A.S. had Tourette's Disorder, but he never provided any documentation to support his claim.  (*Id.*)

26  In short, the school staff members tried being reasonable with him, but they thought he was always

27  contrary and would never agree about anything.  (*Id.*)  They believed that he "grilled" A.S. after

28

1    school each day in an attempt to find something to complaint about, and he usually twisted the truth

2    when doing so.  (*Id.*)

3        Principal Mayer also noted that "many people wondered" if Mr. Smith was "hiding something,"

4    in light of Mr. Smith's response to photographs being taken of A.S. and the fact that A.S. had been

5    in four different elementary schools in four years and had gone to three different pre-schools.  (*Id.*)

6    His staff checked "missing children's databases" for Mr. Smith or A.S., but they did not find

7    anything.  (*Id.*)

8        Principal Mayer then stated that his office staff and A.S.'s classroom teacher "have expressed

9    concern about what appears to be Mr. Smith's escalating erratic, angry, aggressive behavior."  (*Id.*)

10   They felt "that he is out of control."  (*Id.*)  Principal Mayer believed that his staff members were

11   concerned for their personal safety.  (*Id.*)  He said that he had "never before felt such an unease

12   about a parent."  (*Id.*)  He also stated that "two people mention[ed] the possibility of contacting CPS

13   with concern for [A.S.'s] being subjected to his increasingly apparent mental instability."  (*Id.*)

14       On March 5, 2012, Superintendent Liddell wrote a letter to Mr. Smith confirming that her office

15   had received Mr. Smith's "signed assessment plan" and it had been routed to Ms. Sanders, the

16   District's Director of Special Education.  (First Smith Decl., Ex. I.)  She also acknowledged that Mr.

17   Smith had included health information and information about Tourette's Disorder.  (*Id.*)

18       On March 6, 2012, Mr. Smith says he wrote a written complaint to George Valenzuela, the

19   District's Compliance Officer and the person designated to receive complaints to the District.  (First

20   Smith Decl., ¶ 16; *see* First Moore Decl., Ex. ZZ (George Valenzuela declaration).[3])  He says he

21   expressed his dissatisfaction with the IEP process and recounted several incidents of bullying of or

22   discrimination against A.S. because of her disability.  (First Smith Decl., ¶ 16.)  Mr. Smith also says

23   he formally invoked the Uniform Complaint Procedures for purposes of his complaint.  (*Id.*)  Mr.

24   Valenzuela did not respond to the complaint; instead, he had his assistant take it to Superintendent

25   Liddell's office.  (First Moore Decl., Ex. ZZ.)  He was not asked to investigate the complaint.  (*Id.*)

26       On March 6, 2012, A.S. participated in a one-on-one therapy session with Phyllis King, a

27   _____

28       [3] The written complaint was not attached to any brief or declaration and is not in the record.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

Marriage and Family Therapist for Sonoma County.  (*See* First Widen Decl., Ex. HH.)  Ms. King's notes from that session reflect that she and A.S. discussed A.S.'s Tourette's Disorder symptoms and school issues, and that A.S. reported, "unlike father," that "she had only been teased twice" at school.  (*Id.*)  There was another session on March 20, 2012, and Ms. King's notes from that session suggest that there was a discrepancy between Mr. Smith's and A.S.'s descriptions of "issues and things at school like getting teased." (*Id.*)

On March 8, 2012, Mr. Smith called the Proctor Terrace office and "was very angry and aggressive over the phone." (Eichman Decl., Ex. Z.)  He asked whether A.S. was going to "have an assessment before the evaluation." (*Id.*)  He also asked for the extension and location of someone's office, but that information was not provided to him. (*Id.*)

On March 9, 2012, Mr. Smith went to a District office and asked to use the copier to make copies of information on Tourette's Disorder.  (First Widen Decl., Ex. FF (Craven deposition and exhibits).)  An office staff member "had to set limits on him" and have him stop using the copier so that the staff members could "get back to their work flow." (*Id.*)  The office staff member described Mr. Smith as very aggressive and angry, and said that they "were toe-to-toe." (*Id.*)

That same day, Mr. Smith also went to the "SELPA" office, where he demanded information for educators about Tourette's Disorder.  (Eichman Decl., Ex. AA.).  He was referred to Ms. Craven. (*Id.*)  Mr. Smith "pretty overtly badmouthed" Ms. Craven and said that she knew nothing about it. (*Id.*)  A SELPA staff member described him as "very pushy." (*Id.*)

On March 15, 2012, Mr. Smith submitted another complaint to Mr. Valenzuela.  (First Smith Decl., Ex. K.)  He again expressed his dissatisfaction with the IEP process and recounted several incidents (including the photography incident) of A.S.'s being bullied or discriminated against because of her disability.  (*Id.*)  He also requested that any photographs of A.S. being used by the District be removed, but he stated that if asked he might allow a photograph of A.S. to be used.  (*Id.*)

On March 26, 2012, Mr. Smith met with Principal Mayer at his office to discuss whether photographs of A.S. could be included in the school yearbook.  (Eichman Decl., Ex. BB.)  Mr. Smith told Principal Mayer that he approved of A.S.'s photograph being included on the class page of the

1  yearbook.  (*Id.*)  Principal Mayer told him that the yearbook coordinator would check to make sure

2  there was no recognizable candid photograph of A.S. included on the "collage page" of the

3  yearbook.  (*Id.*)  Mr. Smith responded by questioning the right of the school to take candid

4  photographs in the classroom for any use.  (*Id.*)  Principal Mayer said that, while the teacher could

5  give permission for such photographs to be taken, the school nevertheless would not include any

6  candid photographs of A.S.  (*Id.*)  Mr. Smith said that he did not want any photography occurring in

7  the classroom.  (*Id.*)  Principal Mayer told Mr. Smith that he "could not dictate that no photography"

8  be taken in the classroom, to which Mr. Mayer exclaimed loudly, "We'll see about that!"  (*Id.*)  Mr.

9  Smith then left the school office and slammed the door on his way out.  (*Id.*)

10      That same day (even though it was not received by the school until March 28, 2012), Mr. Smith

11  wrote a letter to Ms. Koski.  (First Smith Decl., Ex. B.)  In it, he told Ms. Koski that he had

12  submitted a formal complaint to the District about A.S.'s being photographed without his

13  permission.  (*Id.*)  He further reiterated his demand that A.S. not be photographed and his belief that

14  the she was being photographed to humiliate him and her.  (*Id.*)

15      Later correspondence indicates that the school tried to ensure that no unauthorized photos or

16  videos were taken of A.S.  (*See* Eichman Dec., Exs. N, O.)  For instance, on March 26, 2012, Ms.

17  Koski sent Mr. Smith an email asking him whether he approved of A.S.'s being videotaped when

18  giving biography reports and presentations.  (Eichman Decl., Ex. O.)  Ms. Koski said that if Mr.

19  Smith did not wish A.S. to be taped, she would make sure that A.S. was not.  (*Id.*)  And on April 2,

20  2012, a staff member sent Principal Mayer an email asking him if it was acceptable to include a

21  class photograph in the yearbook if A.S.'s face was intentionally blurred so she could not be

22  identified or clearly seen.  (Eichman Decl., Ex. N.)

23      On April 10, 2012, Mr. Smith submitted a written complaint stating that P scolded A.S. for

24  helping another student and gave A.S. "dirty looks" earlier in the day.  (Eichman Decl., Ex. K.)  The

25  letter was handwritten by Mr. Smith, but signed by A.S. at the bottom.  (*Id.*)

26      A.S.'s teacher, Ms. Koski, said that she never specifically addressed A.S.'s condition with the

27  class because A.S.'s symptoms were not obvious to the students.  (Eichman Decl., Ex. G.)

28

CV 12-03533 LB
ORDER

11

UNITED STATES DISTRICT COURT
For the Northern District of California

Nevertheless, whenever there was a problem or situation regarding unacceptable behavior, she discussed the behavior with her class. (Eichman Decl., Ex. L.) On August 18, 2011, she instructed her students about what bullying and harassment are and how to stop them, and she taught her class the "Second Step Violence Prevention Curriculum" on the following dates during 2011: August 22 and 29; September 6, 12, 13; October 3, 7, 10, 11, 24, 25; November 7, 8; December 5. (*Id.*)

On April 17, 2012, at approximately 3:20 p.m., Mr. Smith "burst" into the main office of Proctor Terrace. (Eichman Decl., Ex. U (Kathy Bassini declaration) ¶ 3.) Office manager Kathy Bassini was there, and Mr. Smith yelled at her, "Mr. Mayer, now!" (*Id.*) Ms. Bassini explained to Mr. Smith that Principal Mayer was in a meeting and was not available. (*Id.*) Mr. Smith continued to yell and point at Ms. Bassini in a very aggressive manner, and he told her that she was not doing her job. (*Id.*) Although Ms. Bassini told Mr. Smith that she had always passed on Mr. Smith's messages to the teachers or Principal Mayer, Mr. Smith kept yelling at her and insisted that she had to take a report. (*Id.*) Mr. Smith then told Ms. Bassini that A.S. had been bullied because another girl had kicked her backpack. (*Id.* ¶ 4.) He wanted to know what Ms. Bassini was going to do about it. (*Id.*) He also said that there were anti-bullying posters all over the school, and the school was going to stand by its word. (*Id.*) Mr. Smith kept insisting that it was Ms. Bassini's job to do something about it. (*Id.*) Mr. Smith then asked if he could submit a report, and Ms. Bassini told him that he could and that she would give it to Principal Mayer. (*Id.*)

The whole time that Mr. Smith was in the office, he was yelling at Ms. Bassini. (*Id.* ¶ 5.) He again insisted on talking to Principal Mayer. (*Id.*) Ms. Bassini told him again that Mr. Mayer was in a meeting and was not available. (*Id.*) Mr. Smith asked where the meeting was, but Ms. Bassini refused to tell him. (*Id.*) Mr. Smith then shouted that he was going to find Principal Mayer and "stormed" out of the office. (*Id.*) In Ms. Bassini's opinion, Mr. Smith yelled in an aggressive manner and seemed irrational, out of control, and unpredictable. (*Id.*) This made her feel uncomfortable. (*Id.*) Normally, Ms. Bassini goes to the counter when a parent comes into the office, but on this occasion, she felt that it was safer to stay across the room by the phone. (*Id.*)

After Mr. Smith left the office to find Principal Mayer, Ms. Bassini called Principal Mayer to

UNITED STATES DISTRICT COURT
For the Northern District of California

1  warn him that Mr. Smith was looking for him and was "on a rampage." (*Id.* ¶ 6; Eichman Decl., Ex.

2  P (Stephen Mayer declaration) ¶ 3.) Ms. Bassini could hear over the phone that Mr. Smith had

3  entered the library, where Principal Mayer was. (Eichman Decl., Ex. U ¶ 6.) Ms. Bassini could hear

4  Principal Mayer ask Mr. Smith to leave because he was in a meeting, but Mr. Smith refused to leave.

5  (*Id.*)

6        Principal Mayer was in the library conducting a Student Study Team meeting with two teachers,

7  Janet Davis and Ginger Matich, Ms. Craven, and the parent of the student being discussed in the

8  meeting. (*See* Eichman Decl., Exs. P (TRO and Stephen Mayer declaration), Q (TRO and Janet

9  Davis declaration), R (TRO and Kim Craven declaration), S (TRO and Virginia Matich

10  declaration).) Mr. Smith "stormed" into the library and was standing with his legs apart and with

11  clenched fists at his side, just inside the doorway of the library, blocking the door. (*Id.*, Ex. P ¶¶ 3,

12  5; *id.*, Ex. Q ¶¶ 3, 5; *id.*, Ex. R ¶¶ 13, 15; *id.*, Ex. S ¶ 5.) A.S. was with him. (*Id.*, Ex. P ¶ 5; *id.*, Ex.

13  Q ¶ 3; *id.*, Ex. R ¶ 13; *id.*, Ex. S ¶ 3.) Ms. Matich stood up and informed Mr. Smith that they were

14  conducting a meeting. (*Id.*, Ex. P ¶ 5.) Mr. Smith told Ms. Matich that he wanted to talk to

15  Principal Mayer. (*Id.*) After hanging up the telephone, Principal Mayer turned and looked at Mr.

16  Smith and calmly told him that they were conducting a confidential meeting and that he could not

17  speak with him at that time. (*Id.*, Ex. P ¶ 5; *see id.*, Q ¶ 4; *id.*, R ¶ 14; *id.*, Ex. S ¶ 4.) Principal

18  Mayer told Mr. Smith that he needed to make an appointment. (*Id.*, Ex. P ¶ 5; *id.*, Ex. Q ¶ 7.) Mr.

19  Smith yelled that he was not going to leave until he spoke with Principal Mayer. (*Id.*, Ex. P ¶ 5; *id.*,

20  Ex. Q ¶ 7; *id.*, Ex. R ¶ 14.) Principal Mayer told Mr. Smith two or three more times that he could

21  not speak with him at that time and asked him to leave and call to make an appointment. (*Id.*, Ex. P

22  ¶ 6.) Mr. Smith yelled, "I'm not going anywhere until I speak with you. My daughter was bullied.

23  [A student] kicked her backpack and I want to know what you're going to do about it!" (*Id.*; *see id.*,

24  Ex. R ¶ 17; *id.*, Ex. S ¶ 7.)

25        Principal Mayer again told Mr. Smith that he was not going to discuss this with him at that time.

26  (*Id.*, Ex. P ¶ 7.) Principal Mayer then told Mr. Smith that he was creating a disturbance and

27  disrupting the campus and that he needed to leave. (*Id.*) Mr. Smith yelled that he was not going

28

anywhere. (*Id.*, Ex. P ¶ 7.) Principal Mayer said to Mr. Smith, "Let's not do this in front of [A.S.]." (*Id.*, Ex. P ¶ 7; *see id.*, Ex. Q ¶ 5; *id.*, Ex. S ¶ 5.) Mr. Smith did not respond to that comment. (*Id.*, Ex. P ¶ 7.) Principal Mayer again asked Mr. Smith to leave because he was causing a disturbance. (*Id.*) Mr. Smith responded: "No! I'm not leaving!" (*Id.*) Principal Mayer then told Mr. Smith that if he did not leave, the police would be called. (*Id.*, Ex. P ¶ 8; *id.*, Ex. Q ¶ 6; *id.*, Ex. S ¶ 6.) Principal Mayer then recounted that he had asked Mr. Smith to leave multiple times and that Mr. Smith refused to do so. (*Id.*, Ex. P ¶ 8.) Principal Mayer then asked Mr. Smith to confirm this, and Mr. Smith did. (*Id.*, Ex. P ¶ 8.) Principal Mayer then called Ms. Bassini and asked her to call 911 to ask for police assistance and tell them that a parent was causing a disturbance at the school and refusing to leave. (*Id.*, Ex. P ¶ 8; *id.*, Ex. Q ¶ 6; *id.*, Ex. R ¶ 18; *id.*, Ex. S ¶ 6; *id.*, Ex. U ¶ 7.) Mr. Smith was three or four feet away from Principal Mayer and heard Principal Mayer say this to Ms. Bassini. (*Id.*, Ex. P ¶ 8.)

Ms. Craven then approached Mr. Smith and told him that he needed to leave immediately. (*Id.*, Ex. P ¶ 9.) Mr. Smith gave her a "hard look" and said, "No." (*Id.*, Ex. P ¶ 9.) Ms. Craven also told Mr. Smith that she was in A.S.'s classroom for the last half hour of the school day and thought that A.S. looked calm and relaxed, not anxious or upset. (*Id.*, Ex. R ¶ 17.) Ms. Craven, who previously had expressed her safety concerns about Mr. Smith, left the library. (*Id.*, Ex. P ¶ 9; *id.*, Ex. R ¶ 18.) Ms. Davis and Ms. Matich escorted the other student's parent out of the building through another door. (*Id.*, Ex. P ¶ 9; *id.*, Ex. Q ¶ 7; *id.*, Ex. S ¶ 7.) Ms. Matich stayed in the library with Principal Mayer. (*Id.*, Ex. P ¶ 9; *id.*, Ex. S ¶ 8.)

Mr. Smith told Principal Mayer, "You've been waiting for this, haven't you?" (*Id.*, Ex. P ¶ 10.) Principal Mayer was unaware of what Mr. Smith meant and did not respond. (*Id.*, Ex. P ¶ 10.) Mr. Smith stood there for a few more moments and then "stormed" out, yelled, "Grow up!," and grabbed his daughter by the hand and "yanked" her hard through the library door. (*Id.*, Ex. P ¶ 10.) Throughout this event, A.S. at first was cowering behind Mr. Smith. (*Id.*, Ex. P ¶ 12.) By the end of the incident, according to Principal Mayer, A.S. was sitting on the floor "in an upright fetal position leaning against the wall staring out of the window at her teacher, Ms. Koski," who was waiting

1  outside with another set of parents (it happened to be P's parents) for the next scheduled SST

2  meeting.  (*Id.*, Ex. P ¶ 12; *see id.*, Ex. R ¶ 17 (A.S. was "crouched down on the floor").)

3      After Mr. Smith left, Principal Mayer called Ms. Bassini and directed her to lock the office in

4  case Mr. Smith went there.  (*Id.*, Ex. P ¶ 11; *id.*, Ex. U ¶ 8.)  He then ushered the next group of SST

5  meeting participants into the library and locked the door.  (*Id.*, Ex. P ¶ 11.)  He asked Ms. Matich

6  and Ms. Craven (who had returned by that time) to conduct the next SST meeting and left the library

7  to go to the office.  (*Id.*, Ex. P ¶ 14; *see id.*, Ex. R ¶ 19.)  The office was kept locked until two Santa

8  Rosa police officers arrived about ten minutes after 911 was called.  (*Id.*, Ex. P ¶ 14.)  By the time

9  the officers arrived, Mr. Smith was no longer on campus.  (*Id.*, Ex. P ¶ 15; *id.*, Ex. Q ¶ 10; *id.*, Ex. R

10  ¶ 20; *id.*, Ex. S ¶ 10.)  They took Mr. Smith's contact information and said they were going to go to

11  his residence to inform him that he could not behave in this manner at the school.  (*Id.*, Ex. P ¶ 15;

12  *id.*, Ex. Q ¶ 10; *id.*, Ex. R ¶ 20; *id.*, Ex. S ¶ 10.)

13      Throughout and after the incident in the library, Ms. Bassini, Principal Mayer, Ms. Davis, Ms.

14  Matich, and Ms. Craven all were concerned for their and A.S.'s safety.  (*Id.*, Ex. P ¶ 13; *id.*, Ex. Q ¶

15  8; *id.*, Ex. R ¶ 19; *id.*, Ex. S ¶¶ 8-9; *id.*, Ex. U ¶ 9.)

16      A.S. did not return to school after the incident.

17  **B. Principal Mayer's and Ms. Craven's Child Abuse Reports to SCHSD**

18      On April 19, 2012 (two days after the incident), Principal Mayer and Ms. Craven both submitted

19  separate reports of suspected child abuse to SCHSD.  (First Widen Decl., Exs. FF (Kim Craven

20  deposition and child abuse report), JJ (Stephen Mayer deposition and child abuse report).).  By email

21  that day, Principal Mayer alerted Ms. Craven, Mr. Matich, Ms. Davis, and Mr. Koski that he had

22  submitted a report, and Ms. Craven replied she had "been going back and forth about it" but thought

23  she would submit one, too.  (First Moore Decl., Ex. FF.)  In response to Ms. Craven's question

24  whether she should amend his report, submit her own, or leave it alone, Principal Mayer told her that

25  he thought it would be more effective for her to submit her own.  (*Id.*)  He also stated that he knew

26  from experience that a report based on mental abuse is a difficult one for SCHSD to act on.  (*Id.*)  In

27  their reports, both Principal Mayer and Ms. Craven described (in their view) Mr. Smith's history of

28

UNITED STATES DISTRICT COURT
For the Northern District of California

angry and paranoid behavior at the school and expressed their concern that it was causing A.S. undue anxiety, as evidenced by her cowering on the floor during the library incident.  (First Widen Decl., Exs. FF, JJ.)  Principal Mayer made clear in the cover letter to his report that "the classroom teacher, the office manager, and [he] have quite a bit of documentation [of past incidents that Ashley has been exposed to] covering 2-3 months."  (First Widen Decl., Ex. JJ.)  Both Principal Mayer and Ms. Craven are mandated reporters of suspected child abuse under California Penal Code § 11165.7(a), which means they could be convicted of a crime for failing to report suspected abuse under California Penal Code § 11166.01.

**C.  The District's Applications for Temporary Restraining Orders against Mr. Smith**

After the library incident, the District applied, on behalf of Principal Mayer, Ms. Davis, Ms. Matich, and Ms. Craven, for temporary restraining orders ("TROs") against Mr. Smith in Sonoma County Superior Court.  (Eichman Decl., Exs. P, Q, R, S.)  The applications were prepared and filed by Mr. Valenzuela.  (*See* Eichman Decl., Exs. P, Q, R, S.)  On April 23, 2012 and April 24, 2012, the Superior Court denied all four applications because Principal Mayer, Ms. Davis, Ms. Matich, and Ms. Craven, in their declarations accompanying the applications, did not show that Mr. Smith knowingly or willfully made a credible threat of violence or was likely to commit further acts of violence.  (Eichman Decl., Ex. T (orders denying the applications).)

**D.  A.S. Is Found to Be Ineligible for Special Education Services**

On April 25, 2012, school psychologist Constance Freeman issued a psychological assessment report of A.S for the IEP.  (Eichman Decl., Ex. D.)  Ms. Freeman noted that A.S. lives with her father, but sees her mother regularly.  (*Id.*)  (A.S.'s parents are divorced.  (*Id.*))  She noted that "[r]ecords indicate that there is a paternal family history of anxiety disorder" and that A.S. had "a history of psychosocial stressors including exposure to domestic violence."  (*Id.*)  A.S.'s self-report results showed, among other things, an "at-risk" concern in the area of "Relations with Parents," which indicated a mildly to moderately disturbed relation with parents.  (*Id.*)  The Roberts Apperception Test revealed that while A.S. was able to identify problems from picture cards, her problem solving almost always involved having "a father or parent figure 'come in to see what is

wrong.'" (*Id.*)  A.S. also showed "very elevated scores" in depressed themes, rejection, and

unresolved problems.  (*Id.*)  Ms. Freeman concluded that while evaluation and testing revealed that

A.S. had some processing difficulties and other issues, under the applicable guidelines, A.S. "does

not qualify for special education as a student with a Specific Learning Disability," "does not qualify

for special education services under the handicapping condition of Emotional Disturbance," and

"does not qualify for special education services as a student with an 'Other Health Impairment.'"

(*Id.*)  Ms. Freeman did state, however, that due to A.S.'s being diagnosed with ADHD and

Tourette's Disorder, and the processing issues exhibited during the evaluation process, the school

should consider "a 504 plan of accommodations," such as giving A.S. preferential seating to reduce

distractions, pairing visual with auditory input in class, providing worksheets without visual clutter,

helping A.S. get started on math problems and allowing her additional time to complete them,

teaching A.S. the meaning of key vocabulary words, helping A.S. read stories or passages and

making sure she comprehended them before moving on, and giving A.S. a quiet place to go if she

feels self-conscious about her "tics."  (*Id.*)

On May 25, 2012, an IEP meeting was held to discuss A.S.'s eligibility for special education

services.  (*See* First Widen Decl., Ex. NN (First Appellate District's order on appeal).)  The District

determined that A.S. did not qualify for such services.  (*See id.*)

**E.  The Juvenile Dependency Proceedings**

**1.  California's Juvenile Dependency Proceeding Process**

One court in this district has summarized California's juvenile dependency proceeding process

as follows:

> In California, dependency proceedings in the juvenile court are special
> proceedings governed by their own set of rules as set forth in the Welfare and
> Institutions Code.  *In re M.C.*, 199 Cal. App. 4th 784, 790, 131 Cal. Rptr. 3d 194
> (2011) (citing *In re Chantal S.*, 13 Cal. 4th 196, 200, 51 Cal. Rptr. 2d 866, 913 P.2d
> 1075 (1996)).  Section 300 of the Welfare & Institutions Code ("WIC") describes
> specific situations that will bring a child within the jurisdiction of the juvenile court
> for dependency proceedings.  A dependency proceeding may be initiated when the
> Department of Child and Family Services ("CFS" or the "Agency") files a WIC § 300
> petition.  Upon filing of a petition, the juvenile court holds a detention hearing to
> determine whether the child requires emergency removal from the home, followed
> shortly thereafter by a jurisdictional hearing to determine whether the allegations in
> the petition that the child comes within the scope of WIC § 300 are true, in which

UNITED STATES DISTRICT COURT
For the Northern District of California

1    case the child is declared a dependent of the juvenile court. WIC §§ 315, 334, 356;
     *see Cynthia D. v. Superior Court*, 5 Cal. 4th 242, 248, 19 Cal. Rptr. 2d 698, 851 P.2d
2    1307 (1993). Jurisdictional findings must be supported by at least a preponderance of
     the evidence. WIC § 355(a); *Cynthia D.*, 5 Cal. 4th at 248, 19 Cal. Rptr. 2d 698, 851
3    P.2d 1307.

4        If the court finds that it has jurisdiction over the child under WIC § 300, then it
     conducts a disposition hearing to determine whether the child may remain in the
5    home under court supervision, which may involve "family maintenance services," or
     whether the child must be removed from the home pursuant to WIC § 361(c),
6    requiring "family reunification services" for twelve months after the child enters
     foster care. *See* WIC §§ 358, 361.5(a)(1) (A), 362. Before determining the
7    appropriate disposition for the child, the court must read and consider the "social
     study of the child made by the social worker," which must include the individual
8    child's case plan developed pursuant to WIC § 16501.1. *See* WIC §§ 358(b),
     16501.1. A child may be removed from a custodial parent if the juvenile court finds
9    clear and convincing evidence that "[t]here is or would be a substantial danger to the
     physical health, safety, protection, or physical or emotional well-being of the minor if
10   the minor were returned home, and there are no reasonable means by which the
     minor's physical health can be protected without removing the minor from the
11   minor's parent's or guardian's physical custody." WIC § 361(c).

12       The juvenile court continues to monitor the family's progress on the case plan by
     holding status review hearings every six months. *See* WIC § 366(a)(1). At these
13   review hearings, the statutory presumption that the child will be returned to parental
     custody may be overcome if the agency shows, by a preponderance of the evidence,
14   that "the return of the child to his or her parent or legal guardian would create a
     substantial risk of detriment to the safety, protection, or physical or emotional
15   well-being of the child." WIC § 366.21(e). If by the twelve month review the court
     does not return the child, and if the court further determines by clear and convincing
16   evidence that reasonable reunification services have been provided or offered to the
     parents but that there is no substantial probability of return within 18 months of
17   removal, then WIC § 366.26 requires the court to terminate reunification services and
     set the matter for a permanency hearing. *See* WIC §§ 366.21, 366.26. At the "§
18   366.26 hearing," the court selects and implements a permanent plan, which may
     involve returning the child home, terminating parental rights, appointing a legal
19   guardianship, or ordering long term foster care placement. *See* WIC § 366.26;
     *Cynthia D.*, 5 Cal. 4th at 249, 19 Cal. Rptr. 2d 698, 851 P.2d 1307.

20

21   *Belinda K. v. Baldovinos*, No. 10-CV-02507-LHK, 2012 WL 464003, at *1-2 (N.D. Cal. Feb. 13,

22   2012) (footnotes omitted).

23       **2. The Juvenile Dependency Proceedings concerning A.S.**

24       On April 23, 2012, after receiving the reports of suspected child abuse from Principal Mayer and

25   Ms. Craven, and after conducting its own investigation (the findings of which are a part of the record

26   in this case), SCHSD filed a petition under California Welfare and Institutions Code § 300 alleging

27   that Mr. Smith failed to protect A.S. because: (1) Mr. Smith had mental health issues with symptoms

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    of paranoia and delusions, and exhibited aggressive, hostile, and menacing behaviors; (2) Mr.

2    Smith's mental health issues contributed to A.S.'s elevated anxiety and stress; and (3) A.S.'s

3    parents' relationship placed A.S. at risk because they had numerous domestic violence incidents.

4    (First Widen Decl., Ex. KK.)  The detention hearing was held on April 24, 2012.  (*See* First Widen

5    Decl., Ex. NN (First Appellate District's order on appeal).)  Mr. Smith and Ms. Smith submitted on

6    the issue of detention, and requested that the matter be set for a jurisdiction and disposition hearing.

7    (*See* First Widen Decl., Ex. QQ (transcript of detention hearing).)

8         SCHSD filed an amended petition on May 17, 2012, to which Mr. Smith objected.  (*See* First

9    Widen Decl., Ex. NN.)  On June 4, 2012, SCHSD filed a second amended petition.  (*See id.*)

10   SCHSD alleged that it had jurisdiction under § 300(b) and (c).  (*See id.*)  Section 300(b) provides a

11   basis for juvenile court jurisdiction if the child has suffered, or if there is a substantial risk that the

12   child will suffer, serious physical harm or illness as a result of the failure or inability of the child's

13   parent or guardian to adequately supervise or protect the child.  Section 300(c) provides a basis for

14   juvenile court jurisdiction if the child is suffering serious emotional damage, or is at substantial risk

15   of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or

16   untoward aggressive behavior toward self or others, as a result of the conduct of the parent.

17        The contested jurisdiction/disposition hearing occurred on August 28, 2012 and October 15,

18   2012.  (*See id.*)  On November 19, 2012, the superior court found that SCHSD failed to meet its

19   burden to show jurisdiction under section 300(b) and (c) based on A.S.'s parents' history of

20   domestic violence, but it found that SCHSD met its burden to show jurisdiction under section 300(b)

21   and (c) based on Mr. Smith's on-going emotional instability and erratic behaviors (which put A.S. at

22   substantial risk of increased anxiety), Mr. Smith's failure to provide medical treatment, and Ms.

23   Smith's failure to protect A.S. from Mr. Smith's conduct.  Regarding disposition, the superior court

24   found that A.S. should be removed from parental custody.  (*See id.*)

25        A.S.'s parents appealed to the Court of Appeal, First Appellate District.  (First Widen Decl., Ex.

26   LL (Mr. Smith's opening and reply briefs); *see* First Widen Decl., Ex. MM (SCHSD's brief).)  Mr.

27   Smith argued that SCHSD failed to present any evidence that he placed A.S. at a substantial risk of

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   suffering substantial "physical harm or illness" under section 300(b) and that there was insufficient

2   evidence to support the superior court's finding that A.S. was at substantial risk of suffering serious

3   emotional damage in his care under § 300(c).  (*See* First Widen Decl., Ex. LL.)  A.S.'s mother

4   argued that the superior court erred by sustaining jurisdiction on the basis of "increased anxiety"

5   because anxiety is not a serious physical illness within the meaning of section 300(b).  (*See* First

6   Widen Decl., Ex. NN.)

7        In his opening and reply briefs to the Court of Appeal, Mr. Smith challenged the sufficiency of

8   Principal Mayer's and Ms. Craven's child abuse reports and attacked Principal Mayer and Ms.

9   Craven as being biased against him.  (*See* First Widen Decl., Ex. LL.)  Mr. Smith said that Principal

10   Mayer's and Ms. Craven's reports contained "unsupportable suppositions" which "no other civil

11   court credited" (*id.*, ECF No. 83-10 at 20) and noted that multiple superior courts found their reports

12   "unpersuasive" and denied the TRO applications (*id.*, ECF No. 83-9 at 7).  Mr. Smith also claimed

13   that Ms. Craven lacked "professional objectivity" (*id.*, ECF No. 83-10 at 29) and "impartiality"

14   because of the "negative opinion" she formed about him after he had been"aggressive toward her"

15   during telephone conversations and in emails (*id.*, ECF No. 83-8 at 14).  He also claimed that she

16   had an "admitted pre-existing bias" against him because he filed a complaint against her and had her

17   removed from A.S.'s IEP process.  (*Id.*, ECF No. 83-8 at 11.)

18        Mr. Smith also attacked the truthfulness of the statements Principal Mayer and Ms. Craven made

19   in their reports.  He said that Principal Mayer's and Ms. Craven's descriptions of the library incident

20   differed in "significant aspects" (*id.*, ECF No. 83-9 at 22) and contained "half-truths and untruths"

21   (*id.*, ECF No. 83-10 at 20).  He also said that Principal Mayer and Ms. Craven never thought A.S.

22   was being subjected to abuse before the library incident (*id.*, ECF No. 83-9 at 19), that Principal

23   Mayer and Ms. Craven did not fear Mr. Smith during the library incident and did not develop such a

24   fear until "after the fact," when they were writing their reports (*id.*, ECF No. 83-9 at 22-23), and that

25   in their reports Principal Mayer and Ms. Craven loosely used medical terms with negative

26   connotations, even though they are not doctors and cannot make those diagnoses, to cast doubt on

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Mr. Smith's sanity (*id.*, ECF No. 83-9 at 25).[4]  He also stated that Principal Mayer and Ms. Craven

2   "readily acknowledged they made great efforts after-the-fact to gather information from other

3   private sources in violation of [Mr. Smith's] privacy rights, to bolster their own claims about [him]

4   and attempt to exonerate their own inactions to protect [A.S.] from bullying on campus."  (*Id.*, ECF

5   No. 83-10 at 20).  At one point, Mr. Smith stated that Principal Mayer and Ms. Craven "instigated"

6   the dependency proceedings "to retaliate" against him.  (*Id.*, ECF No. 83-10 at 19.)

7        On April 18, 2014, the Court of Appeal affirmed the superior court's jurisdictional order but

8   reversed its dispositional order.  (First Widen Decl., Ex. NN.)  As for the jurisdictional

9   determination, it rejected some of the bases on which the superior court ruled in SCHSD's favor.

10  (*Id.*)  It found that there was no evidence to support the superior court's conclusion (with respect to

11  the so-called "b-3" jurisdictional allegation) that A.S. was ever at risk of harm by the willful or

12  negligent failure of Mr. Smith to provide A.S. with medical care.  (*Id.*)  In fact, the court noted that

13  the evidence showed that Mr. Smith consistently provided and aggressively pursued medical and

14  psychological treatment and services for A.S.  (*Id.*)  It also rejected the superior court's conclusion

15  (with respect to the so-called "b-1" jurisdictional allegation) that, based on the incident at the library

16  and Mr. Smith's emotional instability and erratic behavior, A.S. was at substantial risk of physical

17  harm or illness.  (*Id.*)  While the evidence showed that Mr. Smith had a personality disorder that is

18  manifested in angry and erratic behavior, the Court of Appeal found that the record failed to

19  demonstrate how those issues caused any risk that A.S. would suffer serious <u>physical</u> harm or illness

20  (a requirement under section 300(b)) if she remained in his care.  (*Id.*)  The court pointed out that

21  section 300(b) does not provide for jurisdiction based on emotional harm, or, as the superior court

22  found here, a substantial risk of "increased anxiety," and that, under California law, emotional harm

23  in and of itself, absent serious physical harm or a risk of serious physical harm, is not a basis for

24

25        [4] Mr. Smith suggested in a footnote that Principal Mayer and Ms. Craven may have

26  committed slander and libel by loosely using these medical terms and noted that Principal Mayer's
    and Ms. Craven's behavior in this regard "does shed some light upon the motivations and extent of

27  effort made by the school officials to portray [him] in the worst possible light."  (First Widen Decl.,
    Ex. LL, ECF No. 83-10 at 104.)

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    jurisdiction under section 300(b).  (*Id.*)

2          The Court of Appeal, however, affirmed the superior court's finding that SCHSD met its burden

3    to show that jurisdiction existed under section 300(c).  (*Id.*)  For its so-called "c-1" jurisdictional

4    allegation, SCHSD relied upon Mr. Smith's paranoid style of cognitive functioning, which causes

5    him to become angry based on his perception that people may be against him or withholding

6    assistance, and upon A.S.'s reaction to library incident, to support its concerns that Mr. Smith may

7    have been subjecting A.S. to abuse.  (*Id.*)  SCHSD also noted, among other things, that Ms. Craven,

8    who herself was fearful of Mr. Smith based on earlier interactions, opined that A.S.'s reaction to Mr.

9    Smith's behavior during the library incident caused her to be concerned that Mr. Smith was

10   subjecting A.S. to emotional abuse, in the form of undue anxiety, and that Principal Mayer

11   expressed fear that Mr. Smith was going to hit him and stated his concern for the physical and

12   emotional safety of A.S.  (*Id.*)  Under section 300(c), the question before the Court of Appeal was

13   whether there was sufficient evidence that Mr. Smith's condition and erratic and angry behaviors

14   were putting A.S. at substantial <u>risk</u> of suffering serious emotional damage, evidenced by severe

15   anxiety, depression, withdrawal, or untoward aggressive behavior.  (*Id.*)  It noted that no one

16   claimed that Mr. Smith directly inflicted either physical or emotional abuse on A.S. and in fact,

17   during the years, months and days preceding A.S.'s removal, the record reflected no urgent concerns

18   with A.S.'s well-being.  (*Id.*)  Mr. Smith argued that the record showed that, up until the library

19   incident and even in the days thereafter, A.S. was reported to have been doing well in school and,

20   although she was diagnosed with an anxiety disorder, she had no severe needs, behavioral issues, or

21   serious emotional disturbances, and there were no signs of any abuse.  (*Id.*)  The Court of Appeal

22   acknowledged these arguments but pointed out that the question was whether, after the precipitating

23   event at the library, and after various persons (such as Principal Mayer and Ms. Craven, among

24   others) recognized the possibility of A.S.'s being at risk of harm due to anxiety induced by Mr.

25   Smith's outbursts, and in light of Mr. Smith's past history and his current diagnosis, the evidence as

26   a whole supported the finding that A.S. was at <u>risk</u> of serious emotional damage.  (*Id.*)  The Court of

27   Appeal found that it did.  (*Id.*)  It noted that there was evidence that A.S. suffered from anxiety and

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    that Mr. Smith had a personality disorder manifested by periodic outbursts of untoward anger, which

2    increased A.S.'s anxiety.  (*Id.*)  It also noted that Principal Mayer and Ms. Craven observed that A.S.

3    become extremely anxious during the school library incident.  (*Id.*)  Thus, even considering Mr.

4    Smith's arguments that the evidence did not prove he was the cause of A.S.'s anxiety disorder, the

5    Court of Appeal determined that a preponderance of the evidence supported finding that his

6    personality disorder and paranoid cognitive style contributed to the risk of A. S. suffering serious

7    emotional damage.  (*Id.*)  The Court of Appeal thus affirmed the superior court's jurisdictional

8    ruling.  (*Id.*)

9        As for the superior court's dispositional ruling, the Court of Appeal found that while the

10    circumstances present at the time of detention were sufficiently alarming to detain A.S. initially,

11    after all the evidence was compiled, it was insufficient to support removal.  (*Id.*)  It noted that there

12    was no evidence that Mr. Smith had ever abused or neglected A.S. or that she was not well cared for

13    in Mr. Smith's home.  (*Id.*)  It also found that there was no evidence supporting the superior court's

14    conclusion that there was no reasonable means by which A.S.'s emotional health could be protected

15    without removing her from Mr. Smith's custody.  (*Id.*)  Thus, the Court of Appeal held that there

16    was insufficient evidence to support the superior court's dispositional ruling that A.S. could not be

17    safely returned to Mr. Smith's home.  (*Id.*)  The Court of Appeal remanded the matter and directed

18    the superior court to conduct another dispositional hearing in accordance with its order.  (*Id.*)

19        Mr. Smith and Ms. Smith did not seek review of the appellate court's order.

20   **II. PROCEDURAL HISTORY**

21        Mr. Smith filed his original complaint on July 6, 2012.  (Complaint, ECF No. 1.)  On April 15,

22    2013, Mr. Smith filed a Fourth Amended Complaint, which is the operative complaint.  (4AC, ECF

23    No. 32.[5])  He brings the following claims: (1) retaliation in violation of subsections 2(B)(2)-(5) of

24    the ADA (against the District only); (2) retaliation in violation of section 504 of the Rehabilitation

25

26       [5] Mr. Smith filed a First Amended Complaint as a matter of right.  Then, upon Defendants'
motions, the court dismissed Mr. Smith's First, Second, and Third Amended Complaints and

27    narrowed the scope of this action.  (*See* 10/10/2012 Order, ECF No. 20; 1/9/2013 Order, ECF No.

28    26; 3/25/2013 Order, ECF No. 31.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Act (against the District only); and (3) violation of his Fourteenth Amendment due process right to

2  familial association (against Superintendent Liddell, Mr. Valenzuela, Principal Mayer, and Ms.

3  Craven).[6]  (*Id.*)  The gist of his three claims is this: he told Defendants that A.S. was being bullied

4  and discriminated against on the basis of her disability; Defendants did not follow their policies and

5  did not prevent this bullying and discrimination from occurring; and after he continued to complain

6  about this, Defendants retaliated against him by filing false child abuse reports with SCHSD, which

7  led to A.S. being taken away from him.[7]  Defendants answered the Fourth Amended Complaint.

8  (Answer, ECF No. 33.)  The parties thereafter conducted discovery and waited for the juvenile

9  dependency proceedings to conclude.

10      On December 18, 2014, Defendants moved for summary judgment on all of Mr. Smith's claims.

11  (Motion, ECF No. 84.)  Mr. Smith filed an opposition on January 16, 2015, and Defendants filed a

12  reply on January 29, 2015.  (Opposition, ECF No. 95; Reply, ECF No. 96.)  The court held a hearing

13  on the motion on March 19, 2015.  (3/19/2015 Minute Order, ECF No. 107.)

## ANALYSIS

### I. LEGAL STANDARD

16      The court must grant a motion for summary judgment if the movant shows that there is no

17  genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

18  law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material

19  facts are those that may affect the outcome of the case.  *Anderson*, 477 U.S. at 248.  A dispute about

20  a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

21  the non-moving party.  *Id.* at 248-49.

22      The party moving for summary judgment bears the initial burden of informing the court of the

---

23

24      [6] Dr. Harrington, Ms. Sanders, and Ms. Eagan were dismissed as defendants to the action.
(Eagan Dismissal, ECF No. 24; Harrington Dismiss, ECF No. 58; Sanders Dismissal, ECF No. 59.)

25

26      [7] Mr. Smith also suggested in his Fourth Amended Complaint that the filing of the TRO
applications also was done in retaliation, but in his opposition brief he explicitly disclaims the filing

27  of the TRO applications as a basis for his claims.  (*See* Opposition, ECF No. 95 at 23.)  (He does,
however, argue that if the child abuse reports were insufficient to support the issuance of the TROs,

28  they also are not sufficient to support A.S.'s removal from his care.)  Thus, the only retaliatory act
he alleges is the filing of false child abuse reports.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  basis for the motion, and identifying portions of the pleadings, depositions, answers to

2  interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material

3  fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party

4  must either produce evidence negating an essential element of the nonmoving party's claim or

5  defense or show that the nonmoving party does not have enough evidence of an essential element to

6  carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

7  *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076

8  (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need

9  only point out 'that there is an absence of evidence to support the nonmoving party's case.'")

10  (quoting *Celotex*, 477 U.S. at 325).

11      If the moving party meets its initial burden, the burden shifts to the non-moving party to produce

12  evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103.

13  The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence,

14  but instead must produce admissible evidence that shows there is a genuine issue of material fact for

15  trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show

16  a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477

17  U.S. at 323.

18      In ruling on a motion for summary judgment, inferences drawn from the underlying facts are

19  viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith*

20  *Radio Corp.*, 475 U.S. 574, 587 (1986).

21  **II. DISCUSSION**

22      **A. Mr. Smith's Claims Are Not Barred by the *Rooker-Feldman* Doctrine**

23      Defendants first argue that Mr. Smith's claims are barred by the *Rooker-Feldman* doctrine. That

24  doctrine does not apply here.

25      Under 28 U.S.C. § 1257, the United States Supreme Court, not the lower federal courts, is vested

26  with appellate jurisdiction over state court judgments. *Lance v. Dennis*, 546 U.S. 459, 463 (2006)

27  (per curiam). Accordingly, "[r]eview of such judgments may be had only in [the Supreme] Court."

28  *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983). Under the *Rooker-*

UNITED STATES DISTRICT COURT
For the Northern District of California

*Feldman* doctrine, a district court also lacks jurisdiction over a claim amounting to a "de facto appeal" of a state court judgment, which "asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision." *Noel v. Hall*, 341 F.3d 1148, 1163-64 (9th Cir. 2003); *see Feldman*, 460 U.S. at 476; *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923). The *Rooker-Feldman* doctrine is a narrow one. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283-84 (2005). Its application "is confined to cases of the kind from which [it] acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284; *see Skinner v. Switzer*, 562 U.S. 521, 131 S. Ct. 1289, 1297, 179 L. Ed.2d 233 (2011) (same). But "*Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions." *Exxon*, 544 U.S. at 84.

When the federal suit is, at least in part, barred by *Rooker-Feldman*, a federal court "must also refuse to decide any issue that is 'inextricably intertwined' with an issue resolved by the state court in its judicial decision." *Noel*, 341 F.3d at 1158 (citing *Feldman*, 460 U.S. at 486-87). A federal claim is inextricably intertwined with a state court decision if its success depends upon a determination that the state court wrongly decided the issue before it. *Reusser v. Wachovia Bank, N.A.,* 525 F.3d 855, 859 (9th Cir. 2008). Thus, the Ninth Circuit has found claims inextricably intertwined where "'the relief requested in the federal action would effectively reverse the state court decision or void its ruling.'" *Fontana Empire Ctr., LLC v. City of Fontana*, 307 F.3d 987, 992 (9th Cir. 2002) (quoting *Charchenko v. City of Stillwater*, 47 F.3d 981, 983 (8th Cir. 1995)); *see also Cooper v. Ramos*, 704 F.3d 772, 779 (9th Cir. 2012). By contrast, "if a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in the case to which he was a party . . . then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Exxon*, 544 U.S. at 293 (internal quotes omitted). Similarly, *Rooker-Feldman* does not bar federal jurisdiction over federal claims where a state court declined to address the same claims in state proceedings. *Simes v. Huckabee*, 354 F.3d 823, 827 (8th

Cir. 2004); *see also Robinson v. Ayoshi*, 753 F.2d 1468, 1470-71 (9th Cir. 1985), *vacated and remanded on other grounds,* 477 U.S. 902 (1986).

The *Rooker-Feldman* doctrine does not apply here.  Defendants argue that Mr. Smith seeks a de facto appeal of the juvenile court's rulings, but he filed this action long before those rulings were made.  Thus, Mr. Smith is not a "state-court lose[r] complaining of injuries caused by [a] state-court judgmen[t] rendered before the district court proceedings commenced and inviting district court review and rejection of [that] judgmen[t]."  *Exxon*, 544 U.S. at 283-84.  And Defendants' argument that Mr. Smith's claims are "inextricably intertwined" with the state courts' rulings is relevant only if the *Rooker-Feldman* doctrine is first found to apply, and the court finds that it does not.  *Noel*, 341 F.3d at 1158 ("Only when there is already a forbidden de facto appeal in federal court does the 'inextricably intertwined' test come into play[.]").  Finally, to the extent that Defendants suggest that the state courts' rulings divest the court of its jurisdiction over Mr. Smith's action, that argument fails, too.  *Exxon*, 544 U.S. at 292 ("[N]either Rooker nor Feldman supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains sub judice in a federal court.").

**B.  Mr. Smith's Claims Are Barred by California's Issue Preclusion Doctrine**

Defendants also argue that Mr. Smith's claims are barred by California's collateral estoppel doctrine, which is also known as issue preclusion.  *See Exxon*, 544 U.S. at 293  ("Disposition of the federal action, once the state-court adjudication is complete, would be governed [not by *Rooker-Feldman* but] by preclusion law.").  The court concludes that Mr. Smith's claims are so barred.

"The Full Faith and Credit Act, 28 U.S.C. § 1738, originally enacted in 1790, ch. 11, 1 Stat. 122, requires the federal court to 'give the same preclusive effect to a state-court judgment as another court of that State would give.'"  *Exxon*, 544 U.S. at 293 (quoting *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523 (1986)).  Because the juvenile court proceedings occurred in California, the court looks to California's collateral estoppel doctrine. The Ninth Circuit has explained it this way:

> In California, "[c]ollateral estoppel precludes relitigation of issues argued and decided in prior proceedings." *Lucido v. Superior Court*, 51 Cal.3d 335, 272 Cal. Rptr. 767, 795 P.2d 1223, 1225 (1990) (in bank).  California courts will apply collateral estoppel only if certain threshold requirements are met, and then only if

UNITED STATES DISTRICT COURT
For the Northern District of California

application of preclusion furthers the public policies underlying the doctrine.  *See id.* at 1225, 1226.  There are five threshold requirements:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding.  Second, this issue must have been actually litigated in the former proceeding.  Third, it must have been necessarily decided in the former proceeding.  Fourth, the decision in the former proceeding must be final and on the merits.  Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Id.* at 1225.  "The party asserting collateral estoppel bears the burden of establishing these requirements."  *Id.*

*In re Harmon*, 250 F.3d 1240, 1245 (9th Cir. 2001); *see Cooper v. Ramos*, 704 F.3d 772, 784 (9th Cir. 2012) (quoting the same factors).  In its application of the five factors, the court considers the public policies underlying the doctrine, which are the preservation of the integrity of the legal system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation.  *Lucido v. Superior Court*, 51 Cal. 3d 335, 343 (Cal. 1990).  The doctrine has been applied to bar federal lawsuits involving issues raised, litigated, and determined in state court juvenile proceedings.  *See Jensen v. Foley*, 295 F.3d 746, 748-49 (7th Cir. 2002); *Watson v. County of Santa Clara*, No. C-06-04029 RMW, 2010 WL 2077171, at *2-4 (N.D. Cal. May 20, 2010).

Here, Defendants argue that the issue Mr. Smith raises here—whether Defendants retaliated against him by filing false child abuse reports—was already litigated and decided during the juvenile dependency proceedings.  Looking to five-factor test, the fourth and fifth threshold requirements are easily satisfied: the Court of Appeal's decision regarding A.S. was final and on the merits, and Mr. Smith was a party to the juvenile dependency proceedings.

Whether the other three requirements are satisfied is less obvious, but the court concludes that they are, too.  The first threshold requirement is whether the issue sought to be precluded from relitigation is identical to that decided in a former proceeding.  One California appellate court has elaborated on this inquiry:

> Determining whether an issue has been actually litigated in the former proceeding can be difficult where the former judgment or order does not show on its face that the particular issue was decided.  (7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 355, p. 917.)  Where more than one issue was involved, the burden of proof is on the party asserting collateral estoppel to show that a particular issue was adjudicated.  (*Id.* at p. 918, and cases cited therein.) . . . .

Because appellant's collateral estoppel claim is based on issues that she contends

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    were or could have been litigated in the substituted judgment proceeding, we focus
2    on that distinction.  As explained by Witkin: "Despite the established principle that
     the estoppel results only as to issues actually litigated . . . , it is often said that a
3    judgment is binding as to all matters which were raised or which might have been
     raised.  [Citation.]  Is this latter statement incorrect as applied to subsequent suits on a
4    different cause of action?  The conflict appears to be largely one of expression, which
     may be resolved if 'issues' is given a reasonable meaning.  Clearly a former judgment
5    is not a collateral estoppel on issues which might have been raised but were not; just
     as clearly it is a collateral estoppel on issues which were raised, even though some
     factual matters or legal arguments which could have been presented were not.
6    [Citations.]"  (7 Witkin, Cal. Procedure, *supra*, Judgment, § 359, pp. 923-924, italics
     omitted; *accord*, *Border Business Park*, *supra*, 142 Cal.App.4th at p. 1566, 49
7    Cal.Rptr.3d 259.)

8        "The fact that different forms of relief are sought in the two lawsuits is irrelevant,
     for if the rule were otherwise, 'litigation finally would end only when a party ran out
9    of counsel whose knowledge and imagination could conceive of different theories of
     relief based upon the same factual background.'  [Citation.] . . . '. . . Obviously, if
10   [the matter] is actually raised by proper pleadings and treated as an issue in the cause,
     it is conclusively determined by the first judgment.  But the rule goes further.  If the
11   matter was within the scope of the action, related to the subject-matter and relevant to
     the issues, so that it could have been raised, the judgment is conclusive on it despite
12   the fact that it was not in fact expressly pleaded or otherwise urged.  The reason for
     this is manifest.  A party cannot by negligence or design withhold issues and litigate
13   them in consecutive actions.  Hence the rule is that the prior judgment is [collateral
     estoppel] on matters which were raised or could have been raised, on matters litigated
14   or litigable. . . .  [Citation] . . .  "But an issue may not be thus split into pieces.  If it
     has been determined in a former action, it is binding notwithstanding [that] the [party]
15   may have omitted to urge for or against it matters which, if urged, would have
     produced an opposite result . . .  This principle also operates to demand of a
16   defendant that all of its defenses to the cause of action urged by the plaintiff be
     asserted under the penalty of forever losing the right to thereafter so urge them." ' "
17   (*Interinsurance Exchange of the Auto. Club v. Superior Court* (1989) 209 Cal.App.3d
     177, 181-182, 257 Cal.Rptr. 37 (*Interinsurance*), italics omitted; *accord*, *Mobilepark*
18   *West Homeowners Assn. v. Escondido Mobilepark West* (1995) 35 Cal.App.4th 32,
     47-48, 41 Cal.Rptr.2d 393; *Warga v. Cooper* (1996) 44 Cal.App.4th 371, 377-378, 51
19   Cal.Rptr.2d 684.) . . . .

20

21   *Murphy v. Murphy*, 164 Cal. App. 4th 376, 400-02 (Cal. Ct. App. 2008) (alterations in original).

22       Boiled down, this first threshold requirement "addresses whether 'identical factual allegations'

23   are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same."

24   *Lucido*, 51 Cal. 3d at 342 (citing *People v. Sims*, 32 Cal. 3d 468, 485 (Cal. 1982)); *see Hernandez v.*

25   *City of Pomona*, 46 Cal. 4th 501, 511-12 (Cal. 2009).  Moreover, an issue raised and decided in a

26   prior proceeding triggers the collateral estoppel bar even if some factual matters or legal issues that

27   could have been raised were not.  *Murphy*, 164 Cal. App. 4th at 401-02.

28       Here, the issue underlying all three of Mr. Smith's claims here is whether Principal Mayer and

Ms. Craven filed false child abuse reports to retaliate against Mr. Smith. The factual allegation that forms the basis of that issue—that Principal Mayer's and Ms. Craven were biased against Mr. Smith and their child abuse reports were false—is identical to factual allegations made in the juvenile dependency proceedings. As recounted in detail above, in his briefs to the Court of Appeal, Mr. Smith challenged the sufficiency of Principal Mayer's and Ms. Craven's child abuse reports, attacked Principal Mayer and Ms. Craven as being biased against him, and attacked the truthfulness of the statements Principal Mayer and Ms. Craven made in their reports. He even said that Principal Mayer and Ms. Craven "instigated" the dependency proceedings "to retaliate" against him.

And while the issue presented here—whether Principal Mayer and Ms. Craven filed false child abuse reports to retaliate against Mr. Smith—was not explicitly ruled upon by the Court of Appeal (it was asked to determine whether the superior court's jurisdictional and dispositional rulings were made in error), the Court of Appeal found that SCHSD met its burden to show that jurisdiction over A.S. existed under section 300(c). In so ruling, it relied in part upon Principal Mayer's and Ms. Craven's reports, and it considered Mr. Smith's arguments that the reports lacked veracity and that Principal Mayer and Ms. Craven were biased against him because of his complaints. It nevertheless found that the evidence as a whole supported the finding that A.S. was at risk of serious emotional damage (at least to support the jurisdictional determination) and necessarily rejected Mr. Smith's arguments to the contrary. By concluding that the evidence, which included Principal Mayer's and Dr. Craven's reports, supported jurisdiction over A.S., the court necessarily found those reports to be sufficient.

Defendants cite a decision by a federal court in this district that suggests that juvenile dependency rulings should be interpreted in this way. *See Watson*, 2010 WL 2077171 at *2-4 (summary judgment order). The plaintiffs in *Watson* contended that school officials systematically abused their daughter, who was a student at a school in the district and required special education services. *Watson v. County of Santa Clara*, No. C-06-04029 RMW, 2007 WL 2471399, at *1-2 (N.D. Cal. Aug. 27, 2007) (motion to dismiss order). The plaintiffs then became involved and engaged in pro-active conduct to ensure their daughter's educational rights. *Id.* at *3. Thereafter, and allegedly in retaliation for those efforts, one of the school officials allegedly falsely reported that

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    she suspected that the daughter was being sexually abused by the plaintiffs. *Id.* The local child

2    protective services agency investigated the matter and took the daughter into protective custody. *Id.*

3    at *2. Dependency proceedings were commenced and it was determined that the daughter (along

4    with her siblings) should be removed from her parents' custody. *Watson*, 2010 WL 2077171, at *1.

5    The Court of Appeal affirmed the decision, and the California Supreme Court denied review. *Id.*

6        The plaintiffs then sued the school district and several school officials for, among other claims,

7    retaliation in violation of the ADA and Rehabilitation Act and violation of their Fourteenth

8    Amendment right to familial association. *See Watson*, 2007 WL 2471399, at *4, *9. Some of the

9    defendants moved for summary judgment on, among others, the ground that the plaintiffs' claims

10   were barred by California's collateral estoppel doctrine. *See Watson*, 2010 WL 2077171, at *2-4.

11   The district court agreed. It emphasized that the state court proceedings involved a lengthy

12   evidentiary proceeding where the parties were represented by counsel, witnesses testified subject to

13   cross-examination, and the issues surrounding the lawfulness of the daughter being removed from

14   her parents' care were vigorously contested and decided by the state court. *Id.* at *2, *4. "In the

15   end," the district court said, "the trial court found that [the daughter] had been sexually abused and

16   that she and her siblings were at substantial risk such that removal from their parents' custody was

17   appropriate. The issues underlying that decision [such as whether the school official reported false

18   allegations of sexual abuse in retaliation against the plaintiffs] cannot be relitigated here." *Id.* at *4.

19   The district court thus concluded that "even though [the] plaintiffs' civil rights and state tort claims

20   themselves were not litigated in the prior proceeding, such that res judicata does not apply, the

21   claims are nevertheless barred [by collateral estoppel] to the extent they depend upon proof of issues

22   that were decided adverse to [the] plaintiffs in that earlier proceeding." *Id.* at *4.

23       The reasoning set forth by the California Court of Appeal, Fourth District, in an unpublished

24   opinion also supports the court's conclusion that Mr. Smith's claims are barred by California's

25   collateral estoppel doctrine. *See Kemper v. County of San Diego*, D059637, 2013 WL 1716376 (Cal.

26   Ct. App. 2013).[8] In *Kemper*, several San Diego police officers removed Johnneisha Kemper's child

27

28       [8] Although *Kemper v. County of San Diego*, D059637, 2013 WL 1716376 (Cal. Ct. App.
     2013), is an unpublished opinion of the California Court of Appeal, the court may consider its

from her custody without a warrant.  *Id.* at *1.  Thereafter, San Diego County social workers filed a

juvenile dependency petition alleging that the child had been abandoned by Ms. Kemper, Ms.

Kemper's whereabouts were unknown, and reasonable efforts to locate her had been unsuccessful.

*Id.*  At the juvenile detention hearing, the trial court made a prima facie finding on the petition,

detained the child, and ordered the social services agency to continue looking for the child's parents.

*Id.* at 2.  About a month later, the trial court found the allegations supporting jurisdiction under

California Welfare and Institutions Code § 300(g) to be true, assumed jurisdiction over the child,

removed the child from parental custody, placed the child in foster care, and ordered reunification

services.  *Id.*  Ms. Kemper subsequently appeared and sought to have the trial court's decision

overturned or modified, but the trial court declined to do so, and the Court of Appeal affirmed the

trial court's decision.  *Id.* at *2-3.  In doing so, the Court of Appeal said that the trial court

reasonably assumed jurisdiction over the child in light of the allegations that Ms. Kemper abandoned

her child.  *Id.* at *3.

Ms. Kemper then brought a federal civil rights action in superior court against two groups of

defendants: the City of San Diego and the police officers; and the San Diego County and the social

---

reasoning.  *See Jerry Beeman and Pharmacy Servs., Inc. v. Anthem Prescription Mgmt., LLC*, 652
F.3d 1085, 1093 (9th Cir. 2011) ("Defendants correctly argue that we are not precluded from
considering these unpublished decisions as a possible reflection of California law, although they
have no precedential value."), *vacated on other grounds*, 741 F.3d 29 (9th Cir. 2014); *Employers
Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003) ("Granite correctly
notes that we may consider unpublished state decisions, even though such opinions have no
precedential value."); *Nunez v. City of San Diego*, 114 F.3d 935, 943 n.4 (9th Cir. 1997) ("Although
we are not precluded from considering unpublished state court opinions, we are not bound by them
either.") (internal citation omitted) (citing *McSherry v. Block*, 880 F.2d 1049, 1052-53 n.2 (9th Cir.
1989)); *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 895 (9th Cir. 1996) (discussing an unpublished
opinion of the California Court of Appeal but making clear that the opinion is not cited as
"decisional law"); *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dep't*, 387 F. Supp. 2d
1084, 1103 n.7 (N.D. Cal. 2005) (following *Ortiz-Sandoval* and citing an unpublished opinion of the
California Court of Appeal not as "decisional law" but for its "persuasive reasoning"); *see also Lee
v. Pep Boys Manny Moe and Jack of California*, No. C-12-05064 JSC, 2014 WL 129171, at 5 n.6
(N.D. Cal. Jan. 14, 2014) (following *Jerry Beeman* and *Cole* and considering an unpublished
opinion of the California Court of Appeal for its "persuasive reasoning"); *Baltazar v. Yates*, No.
EDCV 04-00274-VBF, at *11 n.8 (E.D. Cal. Apr. 28, 2010) (following *Cole* and considering two
opinions of the California Court of Appeal for their "persuasive reasoning").

workers. *Id.* at *1. As for the police officers, she alleged that they removed her child from her care without prior judicial authorization. *Id.* As for the social workers, she alleged that they filed a juvenile dependency petition that falsely stated that she had abandoned her child and that the social workers did not know where she was and how to contact her, and that the trial court relied on those false representations when making its decisions. *Id.* at *2. Both groups of defendants demurred, arguing, among other things, that Ms. Kemper's claims were barred by California's collateral estoppel doctrine due to the findings and rulings made by the superior court during the juvenile dependency proceeding. *Id.* at *3. The superior court granted the demurrers, finding, among other things, that Ms. Kemper's claims against both groups of defendants were barred by the collateral estoppel doctrine. *Id.* at *4.

Ms. Kemper appealed, and the Court of Appeal affirmed the superior court's ruling regarding San Diego County and the social workers, but reversed the superior court's ruling regarding the City of San Diego and the police officers. *Id.* at *13. With respect to the social workers, the Court of Appeal focused on the issues of "whether the social worker defendants made misrepresentations and whether those misrepresentations caused the termination of her rights" and determined that those issues were litigated and decided adversely to Ms. Kemper in the juvenile dependency proceeding. *Id.* at 6. It explained:

> By assuming jurisdiction over Kemper's child and denying her modification petitions, the juvenile court found the social worker allegations to be true. Although Kemper was not present at the initial hearings, during the later proceedings Kemper had the full opportunity to challenge the truthfulness of the social worker assertions and present evidence that she had not in fact abandoned her baby and/or that she had provided for the baby's support. Within one month after the court assumed jurisdiction, Kemper was represented by counsel and had numerous opportunities to raise the issue in the dependency proceeding, including in a petition for modification or a writ petition to this court. However, Kemper's counsel—after reviewing the record—made a decision not to challenge the court's earlier findings by a writ petition. Moreover, as stated in our prior opinion, Kemper did specifically later raise these challenges in her section 388 modification petitions. (*N.F.*, *supra*, D055922.) In reviewing the court's denial of the petitions and Kemper's arguments that she was denied the effective assistance of counsel, we specifically found that the social services agency was "justified in filing a dependency petition" and the juvenile court had a reasonable basis to assume jurisdiction over the child and maintain that jurisdiction based on Kemper's conduct. (*Ibid.*) On this undisputed record, Kemper had the full opportunity, and did, raise the issue of the social workers' alleged misrepresentations in the prior proceeding, and those claims were litigated and decided against her. As a result, under collateral estoppel principles, Kemper is precluded from challenging the court's findings in a later action.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Kemper argues that as "*a matter of law*" the social workers' misrepresentations
2    were "not litigated and decided in the juvenile dependency case because . . . the only
     issue before that court was Kemper's child's best interests."  (Italics added.)  This
3    assertion is not legally correct.  At the jurisdictional hearing (where the court
     considered the social worker reports regarding Kemper's whereabouts and conduct),
4    the applicable standard was whether the child came within one of section 300's
     statutory categories, and not the "best interests" of the child.  (*See* § 355, subd. (a);
5    Cal. Rules of Court, rule 5.684(f).)  Even if a court may believe a child's best
     interests would be served by dependency court jurisdiction, a court does not have the
6    authority to assume jurisdiction unless it finds true the allegations that the child fits
     into one of section 300's statutory categories.  The issue common to each of these
7    categories is whether the circumstances at the time of the hearing show the child is
     subject to a statutorily-defined risk of future harm.  (*See In re A.S.* (2011) 202 Cal.
     App. 4th 237, 243-244; *In re J.N.* (2010) 181 Cal. App. 4th 1010, 1022.)

8    

9        In this case, the juvenile court found true the allegations of the jurisdictional
     petition under section 300, subdivision (g) that Kemper's child was at substantial risk
10   of harm because she was left without any support and the whereabouts of her parents
     were unknown, and this court made a specific finding that "when these proceedings
11   were initiated, [the social services agency] was justified in filing a dependency
     petition, and the court reasonably assumed jurisdiction of [Kemper's child]."  (*N.F.*,
12   *supra*, D055922.)  We made this finding after reviewing the factual record that
     included Kemper's arguments challenging the truth of the jurisdictional petition (via
13   Kemper's later section 388 petition).  The dependency court's findings, affirmed on
     appeal after Kemper (who was represented by counsel) had the full opportunity to
14   challenge the factual finding through section 388 modification petitions, precludes
     Kemper from relitigating these same issues in her subsequent federal civil rights
     lawsuit.

15   

16   *Id.* at *7.

17       With respect to the police officers, the Court of Appeal focused on the issue of "whether the

18   police officers properly detained the child without prior judicial authorization" and determined that

19   the issue had not been litigated during the juvenile dependency proceeding.  *Id.* at *11.  "Because

20   the issue at a detention hearing concerns the risk to the child in the future," the court explained, "the

21   issue whether the police officers had the right to remove the child from parental custody without a

22   warrant and without prior judicial authorization is not necessarily litigated."  *Id.*

23       To the extent that Mr. Smith argues that he was not able to challenge the veracity of Principal

24   Mayer's or Ms. Craven's child abuse reports in the juvenile dependency proceedings, the court

25   disagrees.  Although the focus of a dependency proceeding is on the child, a parent served with a

26   notice of the proceeding has the status of a party in the juvenile dependency proceeding.  *See In re*

27   *I.A.*, 201 Cal. App. 4th 1484, 1491 (Cal. Ct. App. 2011) ("The acquisition of personal jurisdiction

28   over the parents through proper notice follows as a consequence of the court's assertion of

UNITED STATES DISTRICT COURT
For the Northern District of California

dependency jurisdiction over their child," and this "allows the court to enter binding orders adjudicating the parent's relationship to the child."). And a parent's status as a party to a juvenile dependency proceeding permits the parent to assert and protect her own constitutional interest in the companionship, care, custody and management of her child. *See In re Josiah S.*, 102 Cal. App. 4th 403, 412 (Cal. Ct. App. 2002). Indeed, "a parent in a dependency proceeding not only has a federal due process right under the Fifth and Fourteenth Amendments to confront and cross-examine witnesses, but that right is conferred by statute in dependency hearings." *Id.* (citations omitted). That Mr. Smith perhaps chose not to call Principal Mayer or Ms. Craven as witnesses or to submit other evidence to show that they were biased against him or that their reports was false does not change the fact that he could have done so.

The second threshold requirement—whether the issue sought to be precluded actually was litigated in the former proceeding—also is satisfied. "For purposes of collateral estoppel, an issue was actually litigated in a prior proceeding if it was properly raised, submitted for determination, and determined in that proceeding." *Hernandez*, 46 Cal. 4th at 511 (citing *Sims*, 32 Cal. 3d at 484). "In considering whether these criteria have been met, courts look carefully at the entire record from the prior proceeding, including the pleadings, the evidence, the jury instructions, and any special jury findings or verdicts." *Id.* (citing citations omitted). Review of the briefs that Mr. Smith submitted to the Court of Appeal and the Court of Appeal's order shows that the issue of whether Principal Mayer's and Ms. Craven's child abuse reports lacked veracity and that Principal Mayer and Ms. Craven were biased against him because of his complaints was actually litigated during the dependency proceedings. Mr. Smith argued it, and the Court of Appeal, though its decision affirming jurisdiction over A.S., rejected it.

The third threshold requirement—whether the issue to be precluded necessarily was decided in the former proceeding—also is satisfied. For an issue to have been "necessarily decided" under California law, the issue must "not have been 'entirely unnecessary' to the judgment in the initial proceeding." *Lucido*, 51 Cal. 3d at 342; *see McDaniels v. Mobil Oil Corp.*, 232 Fed. Appx. 642, 643 (9th Cir. 2007). As explained above, in deciding that SCHSD had met its burden to show sufficient evidence to supports its assertion of jurisdiction over A.S., the Court of Appeal necessarily had to

UNITED STATES DISTRICT COURT
For the Northern District of California

1    find those reports to be sufficient and necessarily had to reject Mr. Smith's argument that Principal

2    Mayer and Ms. Craven were biased against him.

3         Finally, the court finds that the public policies underlying the collateral estoppel doctrine—the

4    preservation of the integrity of the legal system, promotion of judicial economy, and protection of

5    litigants from harassment by vexatious litigation—are furthered by the court's decision.  The

6    integrity of the legal system is preserved because Mr. Smith had substantial protections in the

7    dependency proceedings, and "both federalism and comity counsel against [a] federal court's

8    relitigating issues of credibility decided in a state forum."  *Kasdan v. County of Los Angeles*, No. CV

9    12-06793 GAF (JEMx), 2014 WL 6669354, at *6 (C.D. Cal. Nov. 24, 2014).  Judicial economy is

10   promoted because "allowing such collateral attacks would be contrary to judicial economy."  *Id.*

11   And Defendants are protected because "allowing such [collateral] attacks would potentially create

12   infinite litigation, thereby undermining one of the main purposes of a judgment."  *Id.*

13        The collateral estoppel doctrine is "grounded on the premise that 'once an issue has been

14   resolved in a prior proceeding, there is no further fact-finding function to be performed.'"  *Murray v.*

15   *Alaska Airlines, Inc.*, 50 Cal. 4th 860, 864 (Cal. 2010) (quoting *Parklane Hosiery Co. v. Shore*, 439

16   U.S. 322, 336 n.23 (1979)).  After the appellate court affirmed the superior court's finding that

17   jurisdiction over A.S. existed under § 300(c), there is no further fact-finding to be done regarding the

18   issue of whether Principal Mayer and Ms. Craven filed false child abuse reports out of bias against

19   Mr. Smith.  Mr. Smith argued that the reports lacked veracity and that Principal Mayer and Ms.

20   Craven were biased against him, but the appellate court disagreed.  California's collateral estoppel

21   doctrine thus bars Mr. Smith from rearguing this issue now.  His claims must be dismissed with

22   prejudice for this reason.

23        **C. In Any Case, Mr. Smith Cannot Show the Required Causation for Any of His Claims**

24        Even if California's collateral estoppel doctrine did not bar his claims, his claims would fail

25   because he cannot show the required causation.[9]

26   _____

27        [9] Mr. Smith contends that the court cannot enter summary judgment against him based on a
     lack of causation because the "but-for" inquiry is purely a question of fact.  (Opposition, ECF No.
28   95 at 19 (citing *Robinson v. York*, 566 F.3d 817, 825 (9th Cir. 2009).)  This is not entirely correct.
     As one district court has explained:

1

### 1. Mr. Smith's Retaliation Claims Against the District Fail Because He Does Not Establish that His Complaints Were the "But-For" Cause of the Filing of Child Abuse Reports

Retaliation claims, whether brought pursuant to the ADA or the Rehabilitation Act, are analyzed under the same standard. *See Douglas v. Cal. Dept. of Youth Auth.*, 285 F.3d 1226, 1229 n.3 (9th Cir. 2002); *Lee v. Natomas Unified School Dist.*, No. 2:13-cv-00181-MCE-EFB, 2015 WL 871969, at *6 (E.D. Cal. Feb. 27, 2015). Both statutes give non-disabled persons (like Mr. Smith) standing to bring claims for retaliation suffered in protecting the rights of disabled persons (like A.S.). *Barker v. Riverside Office of Edu.*, 584 F.3d 821, 824-28 (9th Cir. 2009). To establish a prima facie claim of retaliation, Mr. Smith must show that: (1) he engaged in a protected activity; (2) an adverse action was taken against him; and (3) a causal connection exists between the protected activity and the adverse action. *See Pardi v. Kaiser Permanente Hosp. Inc.*, 389 F.3d 840, 849 (9th Cir. 2004). If Mr. Smith establishes a prima facie claim, he will avoid summary judgment unless Defendants offer legitimate reasons for the adverse action, whereupon the burden shifts back to Mr. Smith to

---

Causation is generally for the trier of fact to resolve. Nonetheless, the issue may be decided by the Court when, although it is assumed that all the facts asserted by the plaintiff are true, actual causation cannot reasonably be established on the basis of those facts. *See Van Ort*, 92 F.3d at 837 (citing *Springer v. Seaman*, 821 F.2d 871, 876–77 (1st Cir. 1987)); *Benefiel v. Exxon Corp.*, 959 F.2d 805, 808 (9th Cir.1992) (citing cases). The outer bounds of legal causation are also for the Court to decide. This is because the existence of legal cause "essentially depends upon whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." *Sundance Land v. Community First Federal*, 840 F.2d 653, 663 (9th Cir. 1988) (internal quotations omitted). *See also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 478 n.13, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ("What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point" (quoting *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 351–52, 162 N.E. 99 (1928) (Andrews J., dissenting))); *Ballard v. Uribe*, 41 Cal.3d 564, 572 n.6, 224 Cal.Rptr. 664, 715 P.2d 624 (1986).

*Estate of Macias v. Lopez*, 42 F. Supp. 2d 957, 965 (N.D. Cal. 1999), *overruled on other grounds*, 219 F.3d 1018 (9th Cir. 2000). As explained below, the court finds that there are no genuine issues of material fact that prevent the court from entering summary judgment based on either actual or legal causation.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    demonstrate a triable issue of fact as to whether such reasons are pretextual.  *See Pardi*, 389 F.3d at

2    849; *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

3         Defendants argue that Mr. Smith has not established prima facie retaliation claims because he

4    cannot show a causal connection between his complaints and Principal Mayer's and Ms. Craven's

5    decisions to file child abuse reports.  As for Mr. Smith's ADA retaliation claim, Defendants

6    correctly point out the United States Supreme Court recently has defined the standard of causation

7    for a Title VII retaliation claim, *see Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534

8    (2013), and they argue that the same standard applies to Mr. Smith's ADA retaliation and

9    Rehabilitation Act retaliations claims.  Under Title VII, it is "an unlawful employment practice for

10   an employer to discriminate against any of his employees . . . *because* he has opposed any practice

11   made an unlawful employment practice by this subchapter, or because he has made a charge,

12   testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

13   this subchapter."  42 U.S.C. § 2000e-3(a) (emphasis added).  The Court made clear that this means

14   that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged

15   adverse action by the employer."  *Nassar*, 133 S. Ct. at 2534.

16        Defendants cite *Nassar* for their point that this same "but-for" causation standard applies to

17   ADA retaliation and Rehabilitation Act claims, but *Nassar* does not hold this.  Still, the court

18   believes that they are ultimately correct that the standard is the same.  While the Ninth Circuit has

19   not had an occasion to apply *Nassar* to ADA retaliation claims, it has stated that ADA retaliation

20   claims are subject to the same analytical framework as Title VII retaliation claims, *see Barnett v.

21   U.S. Air, Inc.*, 228 F.3d 1105, 1121 (9th Cir.2000) (en banc) (adopting the Title VII retaliation

22   framework for ADA retaliation claims), *vacated on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535

23   U.S. 391 (2002), and the ADA's retaliation provision, like Title VII's, similarly prohibits retaliation

24   "because" an individual has opposed an unlawful discriminatory practice.  *See* 42 U.S.C. §

25   12203(a).[10]  For this reason, district courts in this Circuit have applied the "but-for" causation

26   _____

27        [10] 42 U.S.C. § 12203(a) provides that "[n]o person shall discriminate against any individual
     because such individual has opposed any act or practice made unlawful by this chapter or because
28   such individual made a charge, testified, assisted, or participated in any manner in an investigation,
     proceeding, or hearing under this chapter."

standard for Title VII retaliation claims to ADA retaliation claims as well.  *See Carvajal v. Pride Indus., Inc.*, No. 10CV2319-GPC(MDD), 2014 WL 1921732, at *6 (S.D. Cal. May 14, 2014); *Gallagher v. San Diego Unified Port Dist.*, 14 F. Supp. 3d 1380, 1386-87 (S.D. Cal. Apr.14, 2014); *Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1037 (C.D. Cal. 2014); *Doan v. San Ramon Valley School Dist.*, No. C 13-03866 CRB, 2014 WL 296861, at *3 & n.4 (N.D. Cal. Jan. 27, 2014).

For a similar reason, Mr. Smith must meet this standard for his Rehabilitation Act retaliation claim, too.  The Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, *solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any program or activity receiving federal funding or assistance. 29 U.S.C. § 794(a) (emphasis added).  Section 504(d) of the Rehabilitation Act, in turn, incorporates the ADA's anti-retaliation provision.  29 U.S.C. § 794(d) ("standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under . . . the Americans with Disabilities Act of 1990"); *Hodge v. Oakland Unified School Dist.*, No. C 09–04719 RS, 2012 WL 1933678, at *8 (N.D. Cal. May 29, 2012).  Because of the word "solely," the Rehabilitation Act also has been interpreted to require "but-for" causation.  *See Brooks*, 1 F. Supp. 3d at 1037; *Siring v. Oregon State Bd. of Higher Educ.*, 977 F. Supp. 2d 1058, 1062 (D. Or. 2013); *cf. Head v. Glacier NW, Inc.*, 413 F.3d 1053, 1064-65 & n.63 (9th Cir. 2005).

In their motion, Defendants argue that the "chain of causation" for all Mr. Smith's claims, including his ADA retaliation and Rehabilitation Act retaliation ones, was "broken" because of two "intervening actions," namely, the SCHSD's independent investigation of A.S.'s situation and its decision to seek removal, and the superior court's approval of A.S.'s removal and detention.  They cite opinions discussing 42 U.S.C. § 1983 for this point, however, and they do not offer any authority discussing the ADA or the Rehabilitation Act.  (As described below, whether an intervening cause prevents a defendant from being a proximate or legal cause—as opposed to a actual cause or a cause-in-fact— of a plaintiff's constitutional injury is an issue in section 1983 claims, but it is not a part of the inquiry under the ADA or the Rehabilitation Act.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Mr. Smith points out in his opposition that Defendants also focus on the wrong question, at least

2    for Mr. Smith's ADA retaliation and Rehabilitation Act retaliation claims.  For these claims, the

3    question is, "but for" Mr. Smith's opposition to Defendants' alleged disability discrimination against

4    A.S., would Principal Mayer and Ms. Craven have filed child abuse reports against him?[11]  *See* 42

5    U.S.C. § 12203(a); 29 U.S.C. § 794(a), (d); *Nassar*, 133 S. Ct. at 2534 (for a Title VII retaliation

6    claim, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged

7    adverse action by the employer"); *Doan*, 2014 Wl 296861, at *3 (for an ADA retaliation claim, a

8    plaintiff must show that "there was a but-for causal link between the protected activity and the

9    adverse employment action").

10    In arguing in their reply that the answer to this question is "no," Defendants note that Principal

11    Mayer and Ms. Craven would have filed their reports even if Mr. Craven had not complained

12    because, as they stated in their reports, Principal Mayer and Ms. Craven were worried that Mr.

13    Smith's angry and paranoid behavior, which was displayed at the school numerous times, was

14    causing A.S. undue anxiety, as evidenced by her cowering on the floor during the library incident.

15    Defendants note that the California courts later confirmed that Mr. Smith had a personality disorder

16    that includes a paranoid style of cognitive functioning and which led to aggressive and angry

17    behavior.

18    The court finds Defendants' argument persuasive.  Principal Mayer's and Ms. Craven's reports

19    focused on Mr. Smith's history of aggressive and angry behavior and on the effect it had on A.S.

20    during the library incident, and the California courts later confirmed that this behavior was a factor

21

22    [11] Mr. Smith argues in his opposition that Defendants' allegedly retaliatory conduct includes
23    not only Principal Mayer's and Ms. Craven's filing the child abuse reports but also includes
      Defendants' willful failure to protect A.S. from disability harassment, failure to inform Mr. Smith
24    about his "due process rights under Title II" of the ADA, and failure to provide mandated services to
      A.S.  (Opposition, ECF No. 95 at 21.)  His Fourth Amended Complaint, however, does not support
25    this.  While he did allege that A.S. was bullied and discriminated against and that Defendants did not
      follow their policies and did not prevent this bullying and discrimination from occurring, he did not
26    allege that those acts were retaliatory.  (*See* 4AC, ECF No. 32 ¶¶ 25, 27, 68, 71-78, 84.)  Rather, the
      bullying A.S. allegedly suffered and Defendants' alleged failure to stop it was alleged as the reasons
27    why Mr. Smith complained to the District and its employees.  The only act that he alleged was taken
      in retaliation for his complaints (aside from the TRO applications) was the filing of false child abuse
28    reports.  (*See id.* ¶¶ 49, 50, 60, 61, 79, 80, 87, 88, 93, 95.)

UNITED STATES DISTRICT COURT
For the Northern District of California

that supported SCHSD getting involved.  Defendants also stated their concerns about his behavior in numerous emails sent before the library incident.  Under the high "but-for" causation standard applicable to ADA retaliation and Rehabilitation Act retaliation claims, Mr. Smith must show that his complaints were the reason, as opposed to a reason, Principal Mayer and Ms. Craven filed their child abuse reports.  The Supreme Court made this distinction in *Nasser*.  The Court explained that, for Title VII discrimination claims, the "but-for" test does not apply; instead, a plaintiff need only show that the motive to discriminate was one the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.  *Nassar*, 133 S. Ct. at 2522-23. This is because discrimination is unlawful under Title VII when it was "a motivating factor for any employment practice, even though other factors also motivated the practice."  *See id.* at 2526 (quoting 42 U.S. Code § 2000e-2(m)).  Retaliation, on the other hand, is unlawful under Title VII when it was done "because" a plaintiff opposed discrimination, 42 U.S.C. § 2000e-3(a), so this "motivating factor" test, which allows for an unlawful motive to be one of the motives that caused the employment action, does not apply; instead, a plaintiff must show that "the desire to retaliate was the but-for cause of the challenged employment action."  *Id.* at 2528 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167,176 (2009)); *see also id.* at 2545 (Ginsberg, J., dissenting) (arguing that the "but for" test should not apply to Title VII retaliation claims and that so-called "mixed-motive" retaliation claims should be allowed under the statute).  Here, Mr. Smith provides no evidence that his complaining was the reason, as opposed to a reason, that Principal Mayer and Ms. Craven filed their child abuse reports.  Thus, he has not established satisfied the "but-for" causation standard required for ADA retaliation and Rehabilitation Act retaliation claims.

## 2. Mr. Smith's Section 1983 Claim Fails Because Defendants Did Not Proximately Cause A.S.'s Removal

Mr. Smith's section 1983 claim fails, too, but for a different reason.  "In a § 1983 action, the plaintiff must . . . demonstrate that the defendant's conduct was the actionable cause of the claimed injury."  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) (citing *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981)).  To meet this causation requirement, the plaintiff must establish both causation-in-fact (which is sometimes also known as actual causation), and proximate

UNITED STATES DISTRICT COURT
For the Northern District of California

1   causation (which is sometimes also known as legal causation).  *Id.* (citing *Van Ort v. Estate of*

2   *Stanewich*, 92 F.3d 831, 837 (9th Cir.1996); *Arnold*, 637 F.2d at 1355).

3        A defendant's conduct is a cause-in-fact or actual cause of a plaintiff's injury if it is a "but-for"

4   cause of the injury.  *See White v.* Roper, 901 F.2d 1501, 1505-06 (9th Cir. 1990) ("Sergeant Roper's

5   conduct is an actual cause of White's injury only if the injury would not have occurred 'but for' that

6   conduct.") (citing W. Prosser & W. Keeton, The Law of Torts § 41, at 266 (5th ed. 1984)); *Estate of*

7   *Macias v. Lopez*, 42 F. Supp. 2d 957, 963 (N.D. Cal. 1999), *overruled on other grounds*, 219 F.3d

8   1018 (9th Cir. 2000) ("In order to establish actual causation, a plaintiff must first show that

9   defendant was a 'but for' cause of her injury.") (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378,

10  391 (1989); *Van Ort*, 92 F.3d at 837).  And a defendant's conduct is a proximate or legal cause of a

11  plaintiff's injury if there is "a sufficient causal link between the act or omission of a defendant and

12  any injury suffered by the plaintiff to justify the imposition of liability."  *Estate of Macias*, 42 F.

13  Supp. 2d at 964.

14       Proximate or legal causation "frequently is equated with the concept of 'foreseeability,'" and

15  "[u]nder most circumstances, legal causation does not extend beyond the scope of 'foreseeable

16  risks.'"  *Id.* (citing *Van Ort*, 92 F.3d at 837 (applying foreseeability test to question of proximate

17  cause in section 1983 action); *Hines v. United States*, 60 F.3d 1442, 1450 (9th Cir. 1995) ("The

18  question of proximate cause is usually defined with reference to the scope of the foreseeable risks of

19  the actor's conduct"); *Sundance Land v. Community First Fed. Sav. & Loan*, 840 F.2d 653, 663 (9th

20  Cir. 1988) ("The scope of liability should ordinarily extend to but not beyond the scope of the

21  "'foreseeable risks.'")).

22       Foreseeability, however, is not the only aspect of proximate or legal causation.  "Whether or not

23  legal causation exists may also be determined by the existence of intervening or superseding actual

24  causes."  *Id.*  "The doctrine of intervening or superseding cause has been applied to 42 U.S.C. §

25  1983 actions," and "[t]he presence of such causes have been held to prevent the direct causal

26  connection required for liability" in such actions.  *Id.* at 965 (citing *Van Ort*, 92 F.3d at 837 (in

27  section 1983 actions, the Ninth Circuit has looked to "[t]raditional tort law" to determine whether

28  "intervening causes . . . break the chain of proximate causation"); *White*, 901 F.2d at 1506

UNITED STATES DISTRICT COURT
For the Northern District of California

1    (defendant's "conduct is not the proximate cause of [plaintiff's] alleged injuries if another cause

2    supersedes his liability for the subsequent events"); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d

3    553, 561 (1st Cir. 1989) ("An unforeseen and abnormal intervention breaks the chain of causality,

4    thus shielding the defendant from section 1983 liability")).

5        The parties do not distinguish between cause-in-fact or actual cause and proximate or legal cause

6    in their briefs, but it is clear from their arguments that they dispute whether Defendants were a

7    proximate or legal cause of A.S.'s removal.  As described above, Defendants argue that the "chain of

8    causation" for Mr. Smith's section 1983 claim was "broken" because of two "intervening actions":

9    the SCHSD's independent investigation of A.S.'s situation and its decision to seek removal, and the

10   superior court's approval of A.S.'s removal and detention.  They argue that California Welfare and

11   Institutions Code § 300 "vests the authority to remove a child from the custody of his parent with

12   child protective agencies, peace officers, and the state courts," and this means that Defendants did

13   not cause the constitutional harm that Mr. Smith alleges (i.e., having A.S. taken from him).  (Motion,

14   ECF No. 84 at 24.)  It was SCHSD and the California courts, and not they, that decided to remove

15   A.S.

16       Defendants also cite cases that support its position that the SCHSD and superior court's

17   decisions were intervening causes.  *Stoot v. City of Everett* makes clear that "liability may not attach

18   if 'an intervening decision of an informed, neutral decision-maker "breaks" the chain of causation,'

19   meaning that the harm to the plaintiff can be traced more directly to an intervening actor."  582 F.3d

20   910, 926 (9th Cir. 2009) (quoting *Murray v. Earle*, 405 F.3d 278, 292 (5th Cir. 2005).  In *Stoot*, a

21   police officer coerced statements from the plaintiff and gave those statements to a prosecutor who in

22   turn based a criminal information entirely on the information that was provided to him.  The plaintiff

23   sued the officer for violating his Fifth Amendment rights, and the officer argued that he was not a

24   proximate or legal cause of the plaintiff's injury because it was the prosecutor, and not him, who

25   brought the criminal charges.  The Ninth Circuit rejected the officer's argument in this instance

26   because it was reasonably foreseeable that the prosecutor would use the coerced statements to file

27   criminal charges and because the prosecutor "acted in reliance on the information [the officer]

28   provided rather than independently" and explicitly disclaimed in his affidavit of probable cause that

1    probable cause was based entirely on information he received and was not based on his personal

2    knowledge. *Id.* at 926-27.

3        In another case, *Haugen v. Fields*, a social worker filed a dependency petition with the court

4    juvenile court asking the court to exercise jurisdiction over a child to determine whether the child

5    needed to be removed from his parents' home. *See Haugen v. Fields*, No. 2:05-cv-03109-RHW,

6    Dkt. 1 (Complaint) (Dec. 21, 2005). The parents of the child sued the social worker and others for

7    violating their right to familial integrity. *See id.* After the district court dismissed the plaintiffs'

8    claims against the social worker, the plaintiffs appealed. *See Haugen v. Fields*, 366 Fed. Appx. 787,

9    788 (9th Cir. 2010). The Ninth Circuit found that the social worker was not a proximate cause of the

10   child's removal because the social worker "did not affirmatively seek the child's removal" and "[i]t

11   was the juvenile court rather than [the social worker] that determined that [the child] was at risk of

12   imminent harm and decided that the [social worker's] notice . . . was sufficient to permit the court's

13   removal order." *Id.* at 788-89. The juvenile "court's order was 'an intervening decision of an

14   informed, neutral decision-maker [that broke] the chain of causation.'" *Id.* at 789 (quoting *Stoot v.*

15   *City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009)); *cf. Doe v. Regents of Univ. of Calif.*, No. CIV. S-

16   06-1043 LKK/DAD, 2008 WL 4826136, at *2 (E.D. Cal. Nov. 6, 2008) (noting that, in a section

17   1983 claim for false arrest or malicious prosecution, an independent party's (such as a prosecutor or

18   court) review of the evidence and determination that probable cause exists operates as a check on a

19   police officer's use of false evidence and thus is an intervening action of a third party that breaks the

20   chain of causation).

21       Mr. Smith fails to persuasively challenge *Snoot*'s reasoning and does not address *Haugen* and

22   instead simply argues that it was foreseeable to Principal Mayer and Ms. Craven that SCHSD would

23   consider their "false" child abuse reports when deciding whether to seek removal and would use

24   those reports in its petition for removal. He argues that it also was foreseeable that the superior

25   court and Court of Appeal would rely upon those reports when deciding whether removal was

26   appropriate. Perhaps this is true, but unlike the prosecutor in *Snoot*, two independent

27   bodies—SCHSD and the superior court—both independently reviewed evidence (of which Principal

28   Mayer's and Ms. Craven's reports were only a part) in support of and against A.S.'s removal and

determined that there was enough there to warrant juvenile proceedings.  And like the social worker in *Haugen*, Principal Mayer and Ms. Craven did not ask that A.S. be removed; they merely reported that A.S. may be at risk of suffering mental abuse because of Mr. Smith's behavior.  Accordingly, the court finds that Mr. Smith has not shown that Defendants were a proximate or legal cause of A.S.'s removal.

### CONCLUSION

Based on the foregoing, the court grants Defendants' motion for summary judgment.[12]

**IT IS SO ORDERED.**

Dated: March 27, 2015

_____
LAUREL BEELER
United States Magistrate Judge

UNITED STATES DISTRICT COURT
For the Northern District of California

---

[12] Because the court rules that Mr. Smith's claims are barred by California's collateral estoppel doctrine and, even if they weren't, Mr. Smith has not shown the required causation, the court does not address Defendants' other arguments.

CV 12-03533 LB
ORDER